RAYTHEON PRODUCTION CORPORATION v. COMMISSIONER OF INTERNAL REVENUE.

No. 3956.

Circuit Court of Appeals, First Circuit.

July 28, 1944.

Writ of Certiorari Denied Nov. 20, 1944.

See 65 S.Ct. 192.

Edward C. Thayer, of Boston, Mass., for petitioner.

Newton K. Fox, Sp. Asst. to Atty. Gen. (Samuel O. Clark, Jr., Asst. Atty. Gen., and Sewall Key and J. Louis Monarch, Sp. Assts. to Atty. Gen., on the brief), for respondent.

Before MAGRUDER, MAHONEY, and WOODBURY, Circuit Judges.

MAHONEY, Circuit Judge.

This case presents the question whether an amount received by the taxpayer in compromise settlement of a suit for damages under the Federal Anti-Trust Laws, 15 U.S.C.A. § 1 et seq., is a non-taxable return of capital or income. If the recovery is non-taxable, there is a second question as to whether the Tax Court erred in holding that there was insufficient evidence to enable it to determine what part of the lump sum payment received by the taxpayer was properly allocable to compromise of the suit and what part was allocable to payment for certain patent license rights which were conveyed as a part of the settlement.

Petitioner, Raytheon Production Corporation, came into existence as a result of a series of what both parties as well as the Tax Court have treated as tax free reorganizations. Since we think such is the proper treatment, we shall simplify the facts by referring to any one of the original and successor companies as Raytheon. The original Raytheon Company was a pioneer manufacturer of a rectifying tube which made possible the operation of a radio receiving set on alternating current instead of on batteries. In 1926 its profits were about $450,000; in 1927 about $150,000; and in 1928, $10,000. The Radio Corporation of America had many patents covering radio circuits and claimed control over almost all of the practical circuits. Cross-licensing agreements had been made among several companies including R.C.A., General Electric Company, Westinghouse, and American Telephone & Telegraph Company. R.C.A. had developed a competitive tube which produced the same type of rectification as the Raytheon tube. Early in 1927, R.C.A. began to license manufacturers of radio sets and in the license agreement it incorporated "Clause 9", which provided that the licensee was required to buy its tubes from R.C.A. In 1928 practically all manufacturers were operating under R.C.A. licenses. As a consequence of this restriction, Raytheon was left with only replacement sales, which soon disappeared. When Raytheon found it impossible to market its tubes in the early part of 1929, it obtained a license from R.C.A. to manufacture tubes under the letters patent on a royalty basis. The license agreement contained a release of all claims of Raytheon against R.C.A. by reason of the illegal acts of the latter under Clause 9 but by a side agreement such claims could be asserted if R.C.A. should pay similar claims to others. The petitioner was informed of instances in which R.C.A. had settled claims against it based on Clause 9. On that ground it considered itself released from the agreement not to enforce its claim against R.C.A. and consequently, on December 14, 1931, the petitioner caused its predecessor, Raytheon, to bring suit against R.C.A. in the District Court of Massachusetts alleging that the plaintiff had by 1926 created and then possessed a large and valuable good will in interstate commerce in rectifying tubes for radios and had a large and profitable established business therein so that the net profit for the year 1926 was $454,935; that the business had an established prospect of large increases and that the business and good will thereof was of a value of exceeding $3,000,000; that by the beginning of 1927 the plaintiff was doing approximately 80% of the business of rectifying tubes of the entire United States; that the defendant conspired to destroy the business of the plaintiff and others by a monopoly of such business and did sup-

press and destroy the existing companies; that the manufacturers of radio sets and others ceased to purchase tubes from the plaintiffs; that by the end of 1927 the conspiracy had completely destroyed the profitable business and that by the early part of 1928 the tube business of the plaintiff and its property and good will had been totally destroyed at a time when it had a present value in excess of $3,000,000, and thereby the plaintiff was injured in its business and property in a sum in excess of $3,000,000. The action against R.C.A. was referred to an auditor who found that Clause 9 was not the cause of damage to the plaintiff but that the decline in plaintiff's business was due to advancement in the radio art and competition. The auditor, however, also found that if it should be decided that Clause 9 had turned the development of the radio art away from plaintiff's type of tube, then the damages would be $1,000,000.

In the spring of 1938, after the auditor's report and just prior to the time for the commencement of the trial before a jury, the Raytheon affiliated companies began negotiations for the settlement of the litigation with R.C.A. In the meantime a suit brought by R.C.A. against the petitioner for the non-payment of royalties resulted in a judgment of $410,000 in favor of R.C.A. R.C.A. and the petitioner finally agreed on the payment by R.C.A. of $410,000 in settlement of the anti trust action. R.C.A. required the inclusion in the settlement of patent license rights and sub-licensing rights to some thirty patents but declined to allocate the amount paid as between the patent license rights and the amount for the settlement of the suit. The agreement of settlement contained a general release of any and all possible claims between the parties.

The officers of the Raytheon companies testified that $60,000 of the $410,000 received from R.C.A. was the maximum worth of the patents, basing their appraisal on the cost of development of the patents and the fact that few of them were then being used and that no royalties were being derived from them. In its income tax return the petitioner returned $60,000 of the $410,000 as income from patent licenses and treated the remaining $350,000 as a realization from a chose in action and not as taxable income. The Commissioner determined that the $350,000 constituted income on the following ground contained in the statement attached to his notice of deficiency: "It is the opinion of this office that the amount of $350,000 constitutes income under § 22(a) of the Revenue Act of 1936. There exists no clear evidence of what the amount was paid for so that an accurate apportionment can be made as to a specific consideration for patent rights transferred to Radio Corporation of America and a consideration for damages. The amount of $350,000 has therefore been included in your taxable income."

The pertinent sections of the statute are set out in the margin.[1]

Adverting to the question of whether

[1] Revenue Act of 1936, c. 690, 49 Stat. 1648:

"Sec. 22. Gross income

"(a) General definition. 'Gross income' includes gains, profits, and income derived from salaries, wages, or compensation for personal service * * *, of whatever kind and in whatever form paid, or from professions, vocations, trades, businesses, commerce, or sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from interest, rent, dividends, securities, or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever. * * * * "

"Section 111. Determination of amount of, and recognition of, gain or loss

"(a) Computation of gain or loss. The gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis provided in section 113(b) for determining gain, and the loss shall be the excess of the adjusted basis provided in such section for determining loss over the amount realized."

"Sec. 112. Recognition of gain or loss—

"(a) General rule. Upon the sale or exchange of property the entire amount of the gain or loss, determined under section 111, shall be recognized, except as hereinafter provided in this section.

"(b) Exchanges solely in kind—
* * * * * *
"(4) Same—Gain of corporation. No gain or loss shall be recognized if a corporation a party to a reorganization exchanges property, in pursuance of the plan of reorganization, solely for stock or securities in another corporation a party to the reorganization.

"(5) Transfer to corporation controlled by transferor. No gain or loss shall be recognized if property is transferred to a cor-

that part of the $410,000 which was paid by R.C.A. to Raytheon to settle the anti trust suit was a return of capital or ordinary income, we must observe that the auditor's report is immaterial on that issue. Despite the fact that the auditor found that the loss was not caused by Clause 9, it was open to the jury to come to a different conclusion on the question of liability, and to avoid this R.C.A. settled the suit by compromise.

■ Damages recovered in an antitrust action are not necessarily nontaxable as a return of capital. As in other types of tort damage suits, recoveries which represent a reimbursement for lost profits are income. Swastika Oil & Gas Co. v. Commissioner, 6 Cir., 1941, 123 F.2d 382, certiorari denied 1943, 317 U.S. 639, 63 S.Ct. 30, 87 L.Ed. 515; H. Liebes & Co. v. Commissioner, 9 Cir., 1937, 90 F.2d 932; Sternberg v. Commissioner, 1935, 32 B.T.A. 1039. The reasoning is that since the profits would be taxable income, the proceeds of litigation which are their substitute are taxable in like manner.

Damages for violation of the anti-trust acts are treated as ordinary income where they represent compensation for loss of profits. Commercial Electrical Supply Co. v. Commissioner, 1927, 8 B.T.A. 986; see Park v. Gilligan, D.C.S.D.Ohio 1921, 293 F. 129, 130.

■ The test is not whether the action was one in tort or contract but rather the question to be asked is "In lieu of what were the damages awarded?" Farmers' & Merchants' Bank v. Commissioner, 6 Cir., 1932, 59 F.2d 912; Swastika Oil & Gas Co. v. Commissioner, supra; Central R. Co. of New Jersey v. Commissioner, 3 Cir., 1935,

79 F.2d 697, 101 A.L.R. 1448. See United States v. Safety Car Heating & Lighting Co., 1936, 297 U.S. 88, 98, 56 S.Ct. 353, 80 L.Ed. 500. Plumb, "Income Tax on Gains and Losses in Litigation" (1940) 25 Cornell L. Q. 221. Where the suit is not to recover lost profits but is for injury to good will, the recovery represents a return of capital and, with certain limitations to be set forth below, is not taxable. Farmers' & Merchants' Bank v. Commissioner, supra. Plumb, supra, 25 Cornell L. Q. 221, 225. "Care must certainly be taken in such cases to avoid taxing recoveries for injuries to good will or loss of capital". 1 Paul and Mertens Law of Federal Income Taxation § 6.48.

Upon examination of Raytheon's declaration in its anti-trust suit we find nothing to indicate that the suit was for the recovery of lost profits. The allegations were that the illegal conduct of R.C.A. "completely destroyed the profitable interstate and foreign commerce of the plaintiff and thereby, by the early part of 1928, the said tube business of the plaintiff and the property good will of the plaintiff therein had been totally destroyed at a time when it then had a present value in excess of three million dollars and thereby the plaintiff was then injured in its business and property in a sum in excess of three million dollars." This was not the sort of antitrust suit where the plaintiff's business still exists and where the injury was merely for loss of profits. The allegations and evidence as to the amount of profits were necessary in order to establish the value of the good will and business since that is derived by a capitalization of profits. A somewhat similar idea was expressed in Farmers' & Merchants' Bank v. Commissioner, supra,

---

poration by one or more persons solely in exchange for stock or securities in such corporation, and immediately after the exchange such person or persons are in control of the corporation; but in the case of an exchange by two or more persons this paragraph shall apply only if the amount of the stock and securities received by each is substantially in proportion to his interest in the property prior to the exchange."

"Sec. 113. Adjusted basis for determining gain or loss—

"(a) Basis (unadjusted) of property. The basis of property shall be the cost of such property; except that—

\* \* \* \* \* ●

"(b) Adjusted basis. The adjusted basis for determining the gain or loss from the

sale or other disposition of property, whenever acquired, shall be the basis determined under subsection (a), adjusted as hereinafter provided.

\* \* \* \* \*

"(2) Substituted basis. The term 'substituted basis' as used in this subsection means a basis determined under any provision of subsection (a) of this section or under any corresponding provision of a prior income tax law, providing that the basis shall be determined—

"(A) by reference to the basis in the hands of a transferor, donor, or grantor, or \* \* \*." 26 U.S.C.A. Int.Rev.Code, §§ 22(a), 111(a), 112(a), (b) (4, 5), 113(a), (b) (2) (A).

59 F.2d at page 913. "Profits were one of the chief indications of the worth of the business; but the usual earnings before the injury, as compared with those afterward, were only an evidential factor in determining actual loss and not an independent basis for recovery." Since the suit was to recover damages for the destruction of the business and good will, the recovery represents a return of capital. Nor does the fact that the suit ended in a compromise settlement change the nature of the recovery; "the determining factor is the nature of the basic claim from which the compromised amount was realized." Paul Selected Studies in Federal Taxation, Second Series, pp. 328–9, footnote 76; Helvering v. Safe Deposit & Trust Co. of Baltimore, 1941, 316 U.S. 56, 62 S.Ct. 925, 86 L.Ed. 1266, 139 A.L.R. 1513; Lyeth v. Hoey, 1938, 305 U.S. 188, 59 S.Ct. 155, 83 L.Ed. 119, 119 A.L.R. 410; Central R. of New Jersey v. Commissioner, supra; Farmers' & Merchants' Bank v. Commissioner, supra; Megargel v. Commissioner, 1944, 3 T.C. 238.

But, to say that the recovery represents a return of capital in that it takes the place of the business good will is not to conclude that it may not contain a taxable benefit. Although the injured party may not be deriving a profit as a result of the damage suit itself, the conversion thereby of his property into cash is a realization of any gain made over the cost or other basis of the good will prior to the illegal interference. Thus A buys Blackacre for $5,000. It appreciates in value to $50,000. B tortiously destroys it by fire. A sues and recovers $50,000 tort damages from B. Although no gain was derived by A from the suit, his prior gain due to the appreciation in value of Blackacre is realized when it is turned into cash by the money damages.

Compensation for the loss of Raytheon's good will in excess of its cost is gross income. See Magill Taxable Income, p. 339. 1 Mertens, Law of Federal Income Taxation, § 5.21, footnote 82. Plumb, supra, 25 Cornell L. Q. 225, 6.

██ Since we assume with the parties that the petitioner secured the original Raytheon's assets through a series of tax free reorganizations, petitioner's basis for the good will is the same as that of the original Raytheon. As the Tax Court pointed out, the record is devoid of evidence as to the amount of that basis and "in the absence of evidence of the basis of the business and good will of Raytheon, the amount of any nontaxable capital recovery cannot be ascertained." 1 T.C. 952. Cf. Sterling v. Commissioner, 2 Cir., 1937, 93 F.2d 304.

██ Where the cost basis that may be assigned to property has been wholly speculative, the gain has been held to be entirely conjectural and not taxable. In Strother v. Commissioner, 4 Cir., 1932, 55 F.2d 626, affirmed on other grounds, 1932, 287 U.S. 308, 53 S.Ct. 150, 77 L.Ed. 325, a trespasser had taken coal and then destroyed the entries so that the amount of coal taken could not be determined. Since there was no way of knowing whether the recovery was greater than the basis for the coal taken, the gain was purely conjectural and not taxed. Magill explains the result as follows: "as the amount of coal removed could not be determined until a final disposition of the property, the computation of gain or loss on the damages must await that disposition." Taxable Income, pp. 339–340. The same explanation may be applied to Farmers' & Merchants' Bank v. Commissioner, supra, which relied on the Strother case in finding no gain. The recovery in that case had been to compensate for the injury to good will and business reputation of the plaintiff bank inflicted by defendant reserve banks' wrongful conduct in collecting checks drawn on the plaintiff bank by employing "agents who would appear daily at the bank with checks and demand payment thereof in cash in such a manner as to attract unfavorable public comment". Since the plaintiff bank's business was not destroyed but only injured and since it continued in business, it would have been difficult to require the taxpayer to prove what part of the basis of its good will should be attributed to the recovery. In the case at bar, on the contrary, the entire business and good will were destroyed so that to require the taxpayer to prove the cost of the good will is no more impractical than if the business had been sold.[2]

Inasmuch as we conclude that the portion of the $410,000 attributable to the suit is taxable income, the second question as

---

[2] Since the plant and other physical assets of the taxpayer were not destroyed but were used by it in the new tube business under licenses from R.C.A., the recovery was only for the destruction of business good will and not the physical assets.

**115**

to allocation between this and the ordinary income from patent licenses is not present.

The decision of the Tax Court is affirmed.

---

Hence the cost basis that the taxpayer could deduct from the recovery would only be that attributable to the good will, including the cost of development of its rectifier tube.