*Decisions will be entered under Rule 50.*

RALPH FREEMAN AND GRACE FREEMAN, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 71275. Filed November 25, 1959.

*Richard B. Ryan, Esq.*, for the petitioners.
*D. W. Wolf, Esq.*, for the respondent.

FINDINGS OF FACT.

FISHER, *Judge:* Petitioners, Ralph and Grace Freeman, are husband and wife, residing at 1619 Edgecumbe Road, St. Paul, Minnesota.

For the taxable year December 31, 1953, petitioners filed a joint Federal income tax return with the district director of internal revenue for the district of Minnesota. Ralph Freeman, hereinafter called petitioner, is an individual doing business as the Freeman Electric Supply Company, which was known as the Freeman Electric Company during the late 1940's and early 1950's. Business operations of Freeman Electric Company consisted primarily of the purchase and sale of electric fixtures. Customers of said business included electrical contractors, ultimate consumers, commercial stores (including chain and department stores), and State jobs.

Ralph established said business during the fall of 1945. During and subsequent to the year 1946, his business address was 2864 Chicago Avenue, Minneapolis, Minnesota.

When petitioner started Freeman Electric Company during 1945, the business did not have any goodwill listed on its books. Assets of the business during 1946 consisted of a file cabinet, typewriter, desks, and a truck, having an aggregate value of approximately $3,000.

Sometime during 1947, petitioner became aware of the fact that there was an agreement among suppliers, contractors, and others to prevent his buying and selling electrical fixtures. The parties to this agreement were the St. Paul Contractors Association (or St. Paul Electrical Contractors Association), Minneapolis Electrical Contractors Association, and other parties, all hereinafter referred to as defendants.

The United States Government instituted a prosecution and civil antitrust action against these parties during the latter part of 1950, or during 1951. On March 27, 1953, the United States District Court for the District of Minnesota rendered its decision in said action, and held that defendants had violated the antitrust laws of the United States. The court determined that defendants had combined and conspired to monopolize the trade and commerce in electrical equipment for installation in the Twin Cities area.

Later in 1953, Ralph, doing business as Freeman Electric Company, instituted a civil action under the Sherman and Clayton Antitrust Acts to recover damages from the parties named as defendants in the above-noted proceedings. Said complaint states, in pertinent part, as follows:

1. This Complaint is filed and these proceedings are instituted under the Act of Congress of July 2, 1890, commonly known as the "Sherman Act", 15 U.S. Code, Sec. 1, et seq., and the Act of Congress of October 15, 1941, commonly known as the "Clayton Act", 15 U.S. Code, Sec. 12, et seq., which statutes are hereinafter jointly referred to as the "antitrust laws", to recover damages for injury to the property and business of the plaintiff caused by acts of the defendants in violation of said antitrust laws and for other relief.

\* \* \* \* \* \* \*

20. As a direct and proximate result of the aforesaid acts, practices, agreements, combinations, conspiracies and boycott of the defendants, the plaintiff was prevented from selling electrical lighting fixtures to many consumers for particular jobs which the plaintiff had a reasonable expectation of selling but for said acts; plaintiff and consumers to whom plaintiff had sold electrical lighting fixtures were unable to have electrical lighting fixtures sold by plaintiff installed; plaintiff was prevented from selling electrical lighting fixtures which plaintiff had purchased and held for sale; plaintiff was unable to purchase or secure certain electrical lighting fixtures desired by consumers and therefore was unable to sell to such consumers; plaintiff was denied the right to continue purchasing the electrical lighting fixtures of certain electrical manufacturers; (plaintiff's cost of doing business was substantially increased above what it would have been but for said acts; the normal expansion and growth of plaintiff's business and sales was greatly curtailed and limited; *plaintiff suffered a substantial loss of business and profits which plaintiff had a reasonable expectation of receiving but for said acts; and plaintiff's said business and property were substantially damaged and diminished in value.*

21. The damage and injury to the property and business of the plaintiff and the loss of profits to the plaintiff caused by the aforesaid agreements, combinations, conspiracies, acts and practices of the defendants, as aforesaid, amount in the aggregate to approximately one hundred and thirty-five thousand dollars ($135,000.00).

\* \* \* \* \* \* \*

25. The violations of the antitrust laws by the defendants referred to and specified above and the acts and practices forbidden by the antitrust laws committed by the defendants and referred to and specified above, have *injured the plaintiff in his business and property* as related and specified above in the amount of one hundred and thirty-five thousand dollars ($135,000.00). Three times said amount is four hundred and five thousand dollars ($405,000.00).

WHEREFORE, plaintiff demands judgment against the defendants and each of them for four hundred and five thousand dollars ($405,000.00) plus reasonable attorneys' fees and costs herein. [Emphasis supplied.]

The alleged restraint of trade forming the basis for this civil action occurred during the years 1946 to 1950, inclusive.

On September 4, 1953, the parties to said civil action entered into an agreement providing for a disposition of this civil action without trial.

Said agreement reads, in part, as follows:

2. The parties have concomittantly herewith executed a stipulation of dismissal providing for the dismissal upon the merits, with prejudice and without costs, of the above entitled action.

(a) after a so-called "Consent Decree" has been entered in the case of United States of America v. Minneapolis Electrical Contractors Association, et al., Civil No. 3715, in the United States District Court for the District of Minnesota, Fourth Division, in substantially the form previously discussed and agreed upon between the defendants therein and the Department of Justice and dated on or about August 18, 1953; and,

(b) upon the payment to plaintiff and his counsel of the sum of $32,000.00 by certified check on or about October 12, 1953.

3. Upon the payment of said consideration to plaintiff and his counsel, plaintiff and his counsel will execute and deliver releases in the usual form of *all claims arising out of any of the transactions or matters referred to or alleged*

in the complaint herein as to all of the undersigned defendants and such others as undersigned counsel for the defendants may designate. [Emphasis added.]

Petitioner executed the release referred to in said agreement, the terms of the release reading, in part, as follows:

It is acknowledged that the payment of the above mentioned sum is not and shall not be construed as or taken to imply any admission by any of the parties to whom this release is given of any liability to me or of the truth of any allegation in the complaint in the above entitled matter. *It is further acknowledged that the payment of the foregoing sum shall not be construed as the payment of a penalty, but as a compromise payment in full satisfaction of all actual or statutory damages, costs, and attorney's fees suffered and incurred by me, or claimed to be suffered and incurred by me, on account of the transactions, matters, or events referred to or alleged in the said complaint* and in and about the prosecution of said action. [Emphasis supplied.]

On October 14, 1953, the United States District Court for the District of Minnesota entered its order dismissing this civil action, upon the merits, with prejudice and without costs, pursuant to the stipulation of dismissal entered into by the parties to that action.

Petitioner received $32,000 in settlement of the above-noted action. Eight thousand dollars of said amount was paid for attorney's fees, leaving a balance of $24,000 received by petitioner.

Petitioners reported the $24,000 received from the settlement of the lawsuit in a schedule attached to their 1953 income tax return, as follows:

Received in settlement of lawsuit for treble damages under Sherman Act_____ $24,000
Amount taxable in accordance with court decisions, ⅓_____ 8,000

    Nontaxable _____ 16,000

Petitioners' attorney, who filed the complaint in the aforesaid antitrust suit, assisted in the preparation of the petitioners' return for the taxable year 1953.

Freeman Electric Company did not have a goodwill account on its books and records during the year 1953.

Respondent, in his statutory notice of deficiency, determined that the full amount of $24,000 was includible in taxable income of petitioners under the provisions of section 22(a) of the Internal Revenue Code of 1939, and, accordingly, increased petitioners' taxable income for the year 1953 in the amount of $16,000.

### OPINION.

The sole issue presented is the taxability of the payment in the amount of $24,000 (of a total of $32,000) which petitioners received during the taxable year 1953 in the compromise settlement of the claim they asserted against several distributors of electrical equipment. Petitioners contend that the sum of $16,000 in controversy

(of the aforesaid $24,000 payment) is taxable as an amount received from the disposition of a capital asset under the provisions of sections 111 and 117(a)(1) and (b) of the Code of 1939.[1] In essence, they argue that the amount of $16,000 was not a recovery of treble damages under the Sherman and Clayton antitrust laws, but was compensation for "loss of increase in value of the business" or loss of capital, and loss of capital gain that would have otherwise been realized and, hence, nontaxable as a return of capital. Respondent, in opposition, maintains that the sum of $16,000, which petitioners did not report as taxable income, represented a payment for punitive damages for violation of the Federal antitrust laws and was taxable as ordinary income within the intendment of section 22(a) of the Code of 1939. In the alternative, respondent urges that said amount is taxable as ordinary income since it constitutes a recovery of lost profits because petitioner failed to establish that he had assets during the period involved upon which a return of capital could be based. For reasons hereinafter stated, we agree with respondent.

The taxability of the proceeds of a lawsuit or of a sum received in settlement like the one involved herein depends upon the nature of the claim and the actual basis of recovery. If the recovery represents damages for lost profits, it is taxable as ordinary income. However, if the recovery is received as the replacement of capital destroyed or injured rather than for lost profits, the money received is a return of capital and not taxable. *Raytheon Production Corporation*, 1 T.C. 952 (1943), affd. 144 F. 2d 110 (C.A. 1, 1944), certiorari denied 323 U.S. 779 (1944); *Nicholas W. Mathey*, 10 T.C. 1099, 1104 (1948), affd. 177 F. 2d 259 (C.A. 1, 1949), and cases

---

[1] SEC. 111. DETERMINATION OF AMOUNT OF, AND RECOGNITION OF, GAIN OR LOSS.

(a) COMPUTATION OF GAIN OR LOSS.—The gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis provided in section 113(b) for determining gain, and the loss shall be the excess of the adjusted basis provided in such section for determining loss over the amount realized.

(b) AMOUNT REALIZED.—The amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money) received.

(c) RECOGNITION OF GAIN OR LOSS.—In the case of a sale or exchange, the extent to which the gain or loss determined under this section shall be recognized for the purposes of this chapter, shall be determined under the provisions of section 112.

SEC. 117. CAPITAL GAINS AND LOSSES.

(a) DEFINITIONS.—As used in this chapter—

(1) CAPITAL ASSETS.—The term "capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include—

\* \* \* \* \* \* \*

(b) DEDUCTION FROM GROSS INCOME.—In the case of a taxpayer other than a corporation, if for any taxable year the net long-term capital gain exceeds the net short-term capital loss, 50 per centum of the amount of such excess shall be a deduction from gross income. In the case of an estate or trust, the deduction shall be computed by excluding the portion (if any), of the gains for the taxable year from sales or exchanges of capital assets, which, under section 162(b) or (c), is includible by the income beneficiaries as gain derived from the sale or exchange of capital assets.

cited therein. Also, it is well settled that amounts received as punitive damages for fraud or the exemplary two-thirds portion of treble damages provided for under section 4 of the so-called Clayton Act [2] constitutes taxable income and must be reported as gross income under section 22(a), *supra. Commissioner* v. *Glenshaw Glass Co.*, 348 U.S. 426 (1955), rehearing denied 349 U.S. 925 (1955), reversing 18 T.C. 860 (1952) and 19 T.C. 637 (1953).

Respondent's determination that the amount in controversy is all taxable as ordinary income is, of course, presumptively correct and the burden of proof is upon petitioner to show error therein by a preponderance of the evidence. *Welch* v. *Helvering*, 290 U.S. 111 (1933); *Crown Iron Works Co.* v. *Commissioner*, 245 F. 2d 357, 360 (C.A. 8, 1957); *Meyer* v. *Commissioner*, 243 F. 2d 262 (C.A. 8, 1957), each affirming a Memorandum Opinion of this Court; *H. Liebes & Co.* v. *Commissioner*, 90 F. 2d 932, 935 (C.A. 9, 1937), affirming 34 B.T.A. 677 (1936).

At the outset, it is to be noted that the parties to the compromise settlement in 1953 merely agreed to a lump-sum payment, i.e., $32,000, without specifying in their written agreement to what extent, if any, the money involved herein was allocable to recovery for loss of profits, loss of capital (whether tangible or intangible), punitive or exemplary damages, and attorney fees. The last item was subsequently settled and determined by an actual payment of attorney fees in the amount of $8,000, leaving $24,000 unallocated.

The complaint alleges that the proceedings were instituted to recover damages for injury to the property and business of the plaintiff. The complaint refers quite generally to loss of sales, loss of sources of supply, inability to get merchandise installed, increase in cost of doing business, and impairment of normal expansion and growth.

The only practical issue before us is whether petitioner has established that any part of the $24,000 (excess of settlement figure over attorney's fees) is entitled to capital gains treatment.

It is to be noted that petitioner, in his return, made no claim to capital gains treatment of any part of the settlement money. He returned $8,000 as taxable and regarded $16,000 as "nontaxable." It is quite apparent that he did this in the light of what then appeared to be the state of the law with respect to nontaxability of the exemplary two-thirds of treble damages under the Clayton Act.

---

[2] Section 15. Suits by persons injured; amount of recovery.

Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee. [Oct. 15, 1914, ch. 323, sec. 4, 38 Stat. 731.]

Later, in *Commissioner* v. *Glenshaw Glass Co., supra,* the Supreme Court held that such exemplary damages were taxable as ordinary income. Under the circumstances, it is not surprising that petitioner altered his position, and that he now asks for capital gains treatment of $16,000 of the settlement figure. The question before us is whether or not the evidence and the law support his present claims in relation thereto.

The only factors referred to in the complaint, the settlement agreement, and the release have been referred to above. The release adds that the payment of the amount called for "shall not be construed as the payment of a penalty."

The allegation of injury to property and business does not support a claim for capital gains treatment. There is nothing which requires us to conclude therefrom that there had been a capital loss or destruction of a capital asset, or that there had been some closed capital transaction to be recognized for tax purposes. Mere fluctuation in value of an asset, tangible or intangible, does not give rise to gain or loss. The amount of such capital loss, if there was any, is nowhere fixed by this record. (The expert testimony on this subject will be discussed, *infra*).

Loss of sales is also referred to in the complaint. It is too obvious to require discussion that any amount attributable thereto in the settlement must be taxed as ordinary income.

Reimbursement (if any) attributable to loss of sources of supply, inability to get merchandise installed, increased cost of doing business, and impairment of normal expansion does not give rise to capital gains treatment. Moreover, there is no basis in the record on which some identifiable amount of the settlement may be attributed to these factors. The same may be said with respect to the nebulous claim of loss of increased value of the business.

A brief reference to the expert testimony appears appropriate. The witness assumed that an amount of $24,000 represented loss of earnings for the 4 years 1947 to 1950, inclusive. He then capitalized this amount at 12½ per cent and assumed that the result represented an intangible business loss or injury to capital and goodwill. He concluded from this that four-twelfths of the loss as determined by him was to be attributed to actual loss of profits and eight-twelfths to the intangible injury to capital and goodwill. He therefore allocated $8,000 of the net amount of $24,000 received in the settlement to compensation for loss of profits and $16,000 to loss of capital or goodwill. Whether or not such a computation might be helpful in other settings, it has no force here. There is no evidence in this record of a loss of capital, or goodwill, or any tangible or intangible capital asset or evidence of any closed transaction disposing of or

destroying such an asset recognizable for tax purposes. No goodwill is established, and, by the same token, there is no proof of loss of goodwill. As stated *supra*, fluctuation in the value of assets, tangible or intangible, does not give rise to gain or loss under any circumstances here present or involved.

Under all of the circumstances, we think that the principles applied in *Chalmers Cullins*, 24 T.C. 322 (1955), are likewise to be applied here. In that case, the plaintiffs, including the taxpayer, received the amount of $200,000 in settlement of their antitrust suit. The releases, as in the instant case, did not specify any fixed amounts for the different components of damages alleged in the complaint. Respondent held that the entire amount recovered constituted lost profits. In sustaining respondent, we said, in part (p. 328):

There is no evidence to establish the purpose or purposes for which the money was paid to petitioners. * * * Neither the complaint, nor the settlement agreement, nor the releases, nor the evidence as a whole provides a basis for making an allocation of the recovery and finding that all or part of the sum recovered represented a return of capital.

Similarly, in *Armstrong Knitting Mills*, 19 B.T.A. 318 (1930), we had before us the precise question involving a settlement of two lawsuits, one, in effect, for damage to business and the other for breach of contract. Concluding that the suits did not involve damage to capital, we said (p. 321)—

The amount in question was paid to the petitioner in compromise and settlement of two suits, and there is no evidence to indicate in what proportion the amount could be allocated between the actions. Also, there is no evidence to establish the specific purpose for which the money was paid, other than that it was paid as a lump sum in compromise and settlement of the litigation. Whether the amount represented damages for wrongful injury to the petitioner's good will, or whether it represented damages for loss of profits, or indeed whether the amount was simply paid by the defendants to avoid further expense and harassment resulting from long continued litigation, does not definitely appear.

Petitioners, in support of their position, rely on *Farmers' & Merchants' Bank* v. *Commissioner*, 59 F. 2d 912 (C.A. 6, 1932), reversing 20 B.T.A. 622 (1930), and *Durkee* v. *Commissioner*, 162 F. 2d 184 (C.A. 6, 1947), reversing 6 T.C. 773 (1946). We have carefully considered these cases and find them distinguishable on their facts and not controlling herein. Unlike the instant proceeding, in *Farmers' & Merchants' Bank*, *supra*, the taxpayer did not seek even in part a reparation for loss of profits, but only for tortious injury to its goodwill. Likewise, in *Durkee*, no claim was made for lost profits in the complaint, the gravamen being damage to goodwill of the company. In both cases, the allegations as to profits both before and after the acts complained of "were only an evidential

factor in determining actual loss and not an independent basis for recovery."

In further support of their position, petitioners contend, citing *Herbert's Estate* v. *Commissioner*, 139 F. 2d 756 (C.A. 3, 1943), affirming a Memorandum Opinion of this Court, that their claim against defendants constituted a "chose in action" for injuries to their business and property (and as such was a capital asset) and that when the lawsuit was settled and the money received, said capital asset was disposed of within the meaning of section 111, *supra*, providing that the gain from the sale or other disposition of property for tax purposes shall be the excess amount realized over the adjusted basis of the capital asset. In the instant case, there is no support for the view that the chose in action was for an injury to capital rather than for loss of profits. This distinction is so clearly recognized and analyzed in *H. Liebes & Co.*, 34 B.T.A. 677, 682 (1936), affd. 90 F. 2d 932 (C.A. 9, 1937), that we feel it is unnecessary to extend our discussion beyond reference to the latter case.

Since we cannot accept the allocation offered by petitioners, and the record does not afford any other basis upon which we can make an allocation to his advantage, we hold that the entire sum received in settlement of those claims, i.e., $24,000, represents a recovery for loss of anticipated profits and is taxable to petitioners in full as ordinary income under section 22(a), *supra*. *Phoenix Coal Co.* v. *Commissioner*, 231 F. 2d 420 (C.A. 2, 1956), affirming a Memorandum Opinion of this Court; *H. Liebes & Co.* v. *Commissioner; Chalmers Cullins;* and *Armstrong Knitting Mills*, all *supra*.

We add for completeness that respondent's determination of the deficiency is not, in our opinion, unrealistic, arbitrary, and excessive, as urged by petitioners, but rather follows the only course he could take upon the facts (and lack of facts) presented by the record.

*Decision will be entered under Rule 50.*