ESTATE OF JOSEPH G. TARACIDO, DECEASED, BY UNITED STATES TRUST COMPANY, CHARLES C. LEHING AND IRWIN P. UNDERWEISER, EXECUTORS, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1071–74.     Filed September 10, 1979.

---

*Jay H. Landau* and *Beatrice K. Underweiser,* for the petitioners.
*Ronald E. Friedman,* for the respondent.

FORRESTER, *Judge:* Respondent has determined that petitioners are liable as transferees of the assets of Taracido & Co., Inc. (hereinafter TCI), for a Federal income tax deficiency of $68,384.75 for the taxable year ended February 28, 1969. The only issue remaining for our decision is whether an amount received by petitioners in settlement of a lawsuit constitutes gain from the sale or exchange of a capital asset pursuant to section 1001[1] and section 1221.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

TCI is a corporation organized under the laws of the State of New York on December 11, 1959. TCI filed its Federal income tax return for the fiscal year in issue with the Internal Revenue Service Center at New York, N.Y. Upon the death of its sole shareholder, Joseph Taracido (hereinafter Joseph or decedent), all of the stock of TCI passed to his estate and became an asset thereof. The executors of his estate, United States Trust Co., Charles C. Lehing, and Irwin P. Underweiser (hereinafter petitioners), each executed transferee liability agreements. At the time the petition herein was filed, petitioner United States Trust Co. had its principal office and place of business at New York, N.Y.

Joseph began his insurance career as an agent and upon his graduation from law school was employed by the United States Life Insurance Co. He occupied the position of superintendent of agencies with that company until 1961 and developed its international agency force. In 1961, the then president of Illinois Mid-Continent Insurance Co. (hereinafter IMC), who was form-

---

[1]Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954.

erly a senior vice president of United States Life Insurance Co., hired Joseph to develop an international agency force for IMC.

Two years earlier, Joseph had established TCI for the purpose of engaging in the insurance business. Its role was that of a manager and broker in the international insurance field. As its president and sole stockholder, Joseph obtained qualified individuals to serve as agents with respect to the sale of insurance in areas of Europe, Central and South America, Mexico, the Caribbean, and the Far East.

On April 8, 1964, TCI entered into a management agreement with IMC, effective January 1, 1965, wherein IMC agreed to grant TCI exclusive representation for a 10-year period to December 31, 1974, for the sale of its insurance in Hawaii, Alaska, Puerto Rico, and all other areas outside the continental United States. TCI, as international manager for IMC's sales force, received a 10-percent to 25-percent override on any new business written by IMC's overseas agents.

In early 1965, National Western Life Insurance Co. (hereinafter NW) became interested in acquiring IMC and, pursuant to a proxy fight, was able to obtain the necessary votes to merge with IMC. NW staged the merger for the purpose of expanding its agency sales force and acquiring the business which that force had produced.

Since IMC was now merged into NW, TCI entered into a new management agreement with NW dated June 9, 1965, under which TCI was again designated as manager and exclusive representative of the successor corporation, NW, in all areas outside the continental United States. Pursuant to that agreement, Joseph was given the title of Executive Vice President of International Operations for NW with a salary of $1 per year and the option to purchase 40,000 shares of NW stock under the employee stock option plan. In addition, the management agreement set forth the following terms:

SECOND:

(A) The Manager shall procure insurance agents and insurance brokers and through said agencies transmit to the Company applications for all forms of insurance policies written by the Company; shall deliver policies, contracts, notices, premium receipts and other papers sent to him for that purpose; shall collect and pay over to the Company all moneys payable to it as authorized by the Company; all of which shall be subject to the terms and conditions contained herein.

(B) The Company will not alter, substitute, or amend as presently used by

the Company and Soliciting Agent Agreement or General Agent Agreement or Amendment thereto without at least ninety (90) days written notice to Manager.

(C) The Manager will manage and supervise all phases of the Company operation in said designated territory.

(D) The Manager will execute all standard Company agency forms, on behalf of the Company as its Attorney in Fact.

\*     \*     \*     \*     \*     \*     \*

FOURTH: The exclusive representation of the Company by the Manager will continue only provided that the Manager causes to be written and placed in force with Company during the first calendar year hereof annual premiums paid and in force of at least $500,000, during the second calendar year hereof annual premiums paid and in force of at least $750,000 and during the third calendar year hereof and each year thereafter causes to be written and placed in force annual premiums of at least $1,000,000 or more, or for any period less than one full calendar year the pro rata portion thereof for each such period, respectively.

FIFTH:

(A) The Company will pay to the Manager compensation on the business written and produced by it of (a) one hundred ten per cent (110%) of the first year premiums received by it on ordinary life policies so produced such time as until $350,000 commissions have been paid to the Manager; (b) thereafter Manager shall receive ninety-five per cent (95%) of the additional first year premiums received by Company on ordinary life policies so produced. The above commissions will be comprised of and paid as follows:

1. The commission payable to individual writing agent as determined by his contract with Company.

2. The commission payable to General Agents appointed by the Manager as determined by their contracts.

3. Override commissions payable to the Manager of 25% under (a) above, and 10% under (b) above.

4. The above schedule of payment will revert automatically to the original basis of computation at the end of each calendar year from the inception date of this Agreement or for any period less than one full calendar year the pro rata portion thereof for each period respectively.

(B) The Company will pay to the Manager two and one-half per cent (2½%) of all renewal premiums received by Company on all business so produced by the Manager in the territory assigned to it herein. This renewal commission shall be paid only for the first two (2) years renewal. Thereafter, the Company shall pay the Manager a Service Fee of two per cent (2%) of the premiums received by Company for the renewal of the policies after the tenth year as long as said business produced by it is in full force and effect on the books of the Company, including the business produced in the territory defined above, but Manager shall receive such 2% renewal commission only if such is not being paid to the individual writing agent.

\*     \*     \*     \*     \*     \*     \*

ELEVENTH: The Manager will be paid by the Company a Management Fee of

$2,000 per month for a period of the first twelve (12) months from the inception date of this Agreement.

TWELFTH: The Company covenants and agrees that it will establish an advertising budget for the Manager of $2,500 for the first year of this Agreement and $2,500 for the second year of this Agreement.

\*　　\*　　\*　　\*　　\*　　\*　　\*

FIFTEENTH: This Agreement may be terminated by either party hereto upon giving one (1) year's written notice.

Subsequent to the execution of the management agreement with NW, new commission contracts were executed between the overseas general and soliciting agents and NW, since each agent's authority to write insurance originated only from NW. Approximately 90 percent of TCI's annual income resulted from commission overrides generated by the sale of NW insurance policies through the overseas agency force.

TCI was not licensed to write any form of insurance coverage. Its primary function was that of an international agency force manager under contract with NW. In addition to its management function, TCI coordinated the payment of premiums through an arbitrage procedure, occasioned by the blocked currency policies of several foreign countries. TCI used arbitrage procedures, in conjunction with New York banks, to enable the overseas policyholders the convenience of paying their premiums in their native currencies and then converting such currencies into U.S. dollars.

To furnish this service to NW, all insurance applications and premiums were sent directly to TCI from the overseas agents. The applications were then forwarded to NW's underwriting department and, if accepted, it would issue the policies and send them to TCI for distribution to NW's agents and policyholders.

The management and currency functions of TCI, prior to its president's death in 1967, were performed by a staff of four persons. As one of these individuals, Joseph was actively involved in the supervision of the agency force which comprised approximately 200 overseas agents. He traveled extensively throughout the regions of the Caribbean, Central and South America, Mexico, and the Far East, in an effort to cull and develop qualified life insurance agents to sell policies issued by NW.

Because of Joseph's experience in the international insurance market, TCI was also able to expand its operations by rendering professional services to a number of countries in Europe and

South America. Such services included, inter alia, advising domestic insurance companies on transacting business in foreign countries, and representing the insurance ministries of Venezuela and Panama on insurance problems while offering assistance to such countries in the drafting of their respective insurance laws.

On September 2, 1967, Joseph died. Decedent's brother, Stephen Taracido (hereinafter Stephen), who had managed the Puerto Rican branch office of TCI, returned to New York to operate and preside over the TCI home office. On October 13, 1967, approximately 6 weeks after the death of TCI's president, NW canceled its management agreement with TCI, effective 1 year hence, pursuant to paragraph 15 of the agreement. NW informed the overseas agents of this fact and advised them that they should send all insurance applications directly to NW and that they were now eligible to participate in certain company-sponsored incentive programs.

On or about January 22, 1968, NW informed TCI that it was halting the payment of commission overrides to TCI until an audit could be performed because NW believed that it had paid TCI commissions in excess of the agreed contract rate. Since over 90 percent of TCI's income was generated from commission overrides, this immediate reduction in revenue caused Stephen to curtail his customary visits to the overseas agency force. In October 1968, Stephen was instructed by petitioners to close the TCI offices because of a lack of income.

Petitioners, as executors of decedent's estate and sole shareholders of TCI, initiated a legal action against NW in March 1968. The complaint set forth the following pertinent grounds for the action:

AS AND FOR A FIRST CAUSE OF ACTION:

\*       \*       \*       \*       \*       \*       \*

3. The causes of action alleged herein arose out of the transaction of business by defendant within the State of New York and the commission by defendant of tortious acts causing injury to plaintiff within this state with knowledge that the said acts would have consequences within this state. Defendant derives substantial revenue from interstate and international commerce.

\*       \*       \*       \*       \*       \*       \*

20. If the acts of defendant, as stated hereinabove, are permitted to continue, plaintiff will suffer permanent and irreparable injury and its entire business will be destroyed.

21. Unless restrained, as requested herein, defendant will continue its illegal acts and practices and further its attempts to destroy plaintiff's business by capturing the fruits of plaintiff's efforts.

\*       \*       \*       \*       \*       \*       \*

AS AND FOR A SECOND CAUSE OF ACTION:

\*       \*       \*       \*       \*       \*       \*

24. All of the acts and practices, as set forth herein, constitute a breach of the Agreement between plaintiff and defendant.

25. By reason of all of the foregoing, plaintiff has suffered damages in the sum of not less than $1,000,000.00 and is entitled separately to punitive damages in the sum of $1,000,000.00.

AS AND FOR A THIRD CAUSE OF ACTION:

\*       \*       \*       \*       \*       \*       \*

27. The acts committed by said defendant were wilfully, intentionally and maliciously committed with the intention of interfering with the carrying on of plaintiff's business and affecting its goodwill, credit and reputation and diminishing its profits and said acts have caused great injury to plaintiff.

28. By reason of the foregoing facts, plaintiff has suffered damages of not less than $1,000,000, and is separately entitled to punitive damages in the amount of $1,000,000.

AS AND FOR A FOURTH CAUSE OF ACTION:

\*       \*       \*       \*       \*       \*       \*

30. Prior to commencement of this action, plaintiff duly demanded of defendant that it account for its acts and that it pay over to plaintiff the amounts due it, but defendant has failed and refused to do so, and has not rendered any accounting for the money and value received and retained by it in violation of its obligation to plaintiff, nor paid over to plaintiff such amounts as were received and retained by it.

After NW filed its responsive pleading, TCI's counsel moved for a preliminary injunction which was denied. Counsel also moved for a partial summary judgment with respect to commissions in the amount of $76,338.08, conceded by NW as due TCI as of July 31, 1968, which was granted on September 20, 1968. Subsequent to this judgment, settlement negotiations ensued between the parties and an agreement to compromise the suit was reached on December 30, 1968. Said agreement provided for payment by NW to TCI of a total consideration of $220,000. This amount was specified in the agreement as follows:

(1) The party of the second part will pay to TARACIDO & COMPANY, INCORPORATED on or before December 31, 1968 the sum of Seventy Six Thousand Three Hundred Thirty Eight and 08/100 ($76,338.08) Dollars.

(2) The party of the second part will further pay to TARACIDO & COMPANY, INCORPORATED the sum of One Hundred Forty Three

Thousand Six Hundred Sixty One and 92/100 ($143,661.92) Dollars, one half thereof to be paid on July 1, 1969 and the remaining one half on January 5, 1970.

This $220,000 settlement figure was a result of extensive computations and negotiations by the parties to the pending litigation. Such negotiations began on November 20, 1968, when NW tendered two checks to TCI in the respective amounts of $76,338.08 and $53,481.50. These checks were returned to NW by TCI on November 22, 1968, because TCI computed that it was entitled to commissions in excess of $250,000. NW thereupon amended its offer to settle the litigation by offering $215,000 which, after further negotiations, was raised to $220,000.[2] However, while NW and TCI had each developed computations to support the commission arrearage, they had no discussions or computations regarding the manner of apportioning the $220,000 settlement proceeds.

Pursuant to the settlement agreement, TCI received $76,338.08 from NW on December 31, 1968. The remaining $143,661.92 was received by decedent's estate from NW, in two equal installments of $71,830.96, on the respective dates of July 1, 1969, and January 5, 1970. On February 28, 1969, a special meeting of the shareholders was held dissolving TCI and distributing its net assets to its shareholders.

TCI reported $76,338.08 of the $220,000 settlement amount as ordinary income on its corporate income tax return for the calendar year ended December 31, 1968. The final return of TCI for the short period from January 1, 1969, to February 28, 1969, indicates no recognition of the $143,661.92 settlement amount due TCI.[3]

In his statutory notice of deficiency, respondent determined that TCI had additional taxable income for inclusion in its final

[2]Shortly after decedent's death, petitioners made a valuation of TCI for purposes of selling it to a New York insurance agency.

Two alternative methods were employed in determining the appraised value of TCI. One method used a formula based on 150 percent of earned commissions plus book value, and the other method employed a formula based on 6 times 1 year's net income plus book value.

Under the former method, TCI had an appraised value of $301,800, and pursuant to the latter method, it had an appraised value of $311,600. Upon notification of NW's cancellation of its management contract with TCI, the prospective buyer terminated all purchase negotiations with TCI. The appraised valuation of TCI had little, if any, impact on the settlement amount of $220,000.

[3]The $143,661.92 settlement amount was also excluded from the estate's income tax return. However, this sum did find its way into the computation of decedent's estate tax since respondent increased the valuation of decedent's interest in TCI to reflect such amount.

return in the amount of $143,661.92. Respondent found that TCI, as a cash basis taxpayer, did not clearly reflect income for the short taxable period from January 1, 1969, through February 28, 1969, by its failure to include the settlement amount of $143,661.92 in income.[4] He further determined that said amount was not received from the sale or exchange of a capital asset but, rather, was received as ordinary income from the termination of TCI's insurance agency contract with NW and the general release of all rights to commissions actually due and future renewal commissions.

OPINION

Respondent argues that the $143,661.92 amount paid by NW in settlement of the lawsuit brought by TCI represented a payment for the relinquishment of TCI's rights to receive present and future commission income due under the management agreement terminated by NW. Petitioners, on the other hand, contend that TCI had substantial goodwill as an international insurance broker and managing agent and that it had a proprietary interest in its foreign agency sales force which NW destroyed. The parties are in agreement that the proper test to be applied in cases of this kind is that the tax character of the settlement proceeds is determined by the nature of the claims involved and the basis of the recovery. *Lyeth v. Hoey,* 305 U.S. 188 (1938); *Freeman v. Commissioner,* 33 T.C. 323 (1959); *Booker v. Commissioner,* 27 T.C. 932 (1957); *Megargel v. Commissioner,* 3 T.C. 238 (1944); *Raytheon Production Corp. v. Commissioner,* 1 T.C. 952 (1943), affd. 144 F.2d 110 (1st Cir. 1944), cert. denied 323 U.S. 779 (1944).

Petitioners brought suit to recover $2 million in compensatory damages and $2 million in punitive damages based upon grounds of breach of contract and intentional interference with TCI's business. The breach of contract action was founded on the withholding of commissions allegedly due TCI. The intentional interference of business tort action was based upon, inter alia, the instruction by NW to the foreign agency force that such agents should deal directly with NW, thereby diminishing TCI's profits.

---

[4]We note that petitioners are not contesting respondent's determination that the final period return of TCI did not clearly reflect income.

It is well settled that if the nature of the claim settled represents damages for lost profits, it is taxable as ordinary income. *Freeman v. Commissioner*, 33 T.C. 323, 327 (1959); *Raytheon Production Corp. v. Commissioner*, 1 T.C. 952 (1943); affd. 144 F.2d 110 (1st Cir. 1944); *Armstrong Knitting Mills v. Commissioner*, 19 B.T.A. 318 (1930). However, if the nature of the claim settled is received as the replacement of capital destroyed or the sale or exchange of a capital asset, then it is a nontaxable return of capital or taxable as capital gains, respectively. *Bresler v. Commissioner*, 65 T.C. 182 (1975); *Sager Glove Corp. v. Commissioner*, 36 T.C. 1173 (1961), affd. 311 F.2d 210 (7th Cir. 1962), cert. denied 373 U.S. 910 (1963); *Estate of Carter v. Commissioner*, 35 T.C. 326 (1960), affd. 298 F.2d 192 (8th Cir. 1962), cert. denied 370 U.S. 910 (1962); *Reid v. Commissioner*, 26 T.C. 622, 633 (1956); *Goldsmith v. Commissioner*, 22 T.C. 1137 (1954).

In the instant case, the only practical issue before us is whether petitioners have established that any part of the $143,661.92 settlement amount is either a return of capital[5] or entitled to capital gains treatment. If the complaint stated only the breach of contract action for lost commissions then our path would be easy since the nature of the claim settled would clearly represent only damages for lost profits and be taxable as ordinary income. *State Fish Corp. v. Commissioner*, 48 T.C. 465, 472–473 (1967). However, the complaint also refers quite generally to interference with the carrying on of TCI's business affecting its goodwill, credit, and reputation.

Petitioners maintain that TCI had intangible capital assets consisting of its goodwill and foreign agency force. There is nothing in the record, however, which persuades us that there had been a capital loss or destruction of a capital asset. To the contrary, the record does show that TCI was the mere alter ego of decedent. The management contract which was executed between TCI and NW was, in substance, a management contract between decedent and NW. This is evidenced by the fact that decedent received, as part of the agreement, a perfunctory title,

---

[5]Petitioners argue on brief that if the settlement amount is determined by this Court to be compensation for the conversion or destruction of capital assets (e.g., goodwill), then no capital gains tax is due since the amount received by TCI or its shareholders is no greater than the basis of the assets destroyed. This return of capital question is never reached, however, if we find that the settlement proceeds are not entitled to capital gains treatment.

de minimis compensation, and enrollment in NW's employee stock option plan.

It is also equally clear from the testimony offered at trial that decedent was the sine qua non of TCI's success. He was a seasoned international insurance consultant who apparently had an outstanding ability at organizing and developing overseas agency forces. Indeed, TCI had a staff of only four individuals, including decedent, and its future success as a corporate entity was inextricably tied to decedent's ability, experience, and qualifications.

The facts of this case establish that any value which TCI may have had at the time of settlement, in addition to its tangible assets, was due to the personal ability, business acquaintance-ship, and other individualistic characteristics of decedent. Such personal qualities do not constitute goodwill as an item of property. *MacDonald v. Commissioner*, 3 T.C. 720, 727 (1944).

This is not. the case of an individual selling insurance. Decedent sold no policies. Nor was TCI licensed to do so. The cases to which petitioners refer this Court deal with insurance agencies that sell insurance and the sale of these agencies to third parties. Such cases are inapposite to the facts at hand. Ordinarily when an insurance agent sells his business, including all its records, we have found that the amount received on the sale was from the sale of a capital asset and the gain realized was capital gain. *Kenney v. Commissioner*, 37 T.C. 1161 (1962).

Furthermore, in the case of a true insurance business, a major intangible asset sought to be acquired by the prospective buyers is the insurance expiration records.[6] See *Johnson v. Commissioner*, 53 T.C. 414 (1969). NW maintained and retained such records. The only records which TCI maintained were those dealing with the foreign agency force which amounted to one large Rolodex file consisting of approximately 200 cards. Therefore, neither TCI nor decedent was an insurance agent but, rather, decedent

---

[6]These are the records of an insurance firm, including copies of the insurance policies, showing the names of the insured, the amount and nature of the income coverage, the location of the risk, the policy expiration date, the premium, and other data concerning insurance carried by the client.

Their importance as intangible assets was aptly noted under *Marsh & McLennan, Inc. v. Commissioner*, 51 T.C. 56, 58 (1968), affd. 420 F.2d 667 (3d Cir. 1969):

"Such insurance expirations aid in obtaining renewals of the business of the acquired broker's accounts by supplying information pertinent to the insurance needs of the accounts and permitting it an advantage over competitors for the business by furnishing it an entree to the insured which would not otherwise be available."

through his solely owned corporation acted as a manager of insurance agents.

Petitioners' other arrow similarly misses its mark when they argue that TCI had a proprietary interest in the foreign agency sales force. This argument approaches the chimerical when one considers that the general and soliciting agents executed new commission agreements with NW after the merger of IMC and NW. In addition, NW had the final approval on all insurance applications, and furthermore, the foreign agents were agents of NW—not TCI—since the former was the insurer and the latter the manager. A close analysis of the facts discloses that if any party can be said to have had a proprietary interest in the foreign sales force, it was NW and not its managing agent TCI.

It is a basic tenet of Federal tax law that tax consequences should turn on the substance of a transaction rather than on its form. *Gregory v. Helvering*, 293 U.S. 465 (1935). The reality of the situation hereunder is that decedent obtained an employment contract (via his closely held corporation) with NW for the primary purpose of managing its foreign agency force. It is clear from the record that NW viewed the management contract with TCI as an employment contract, in substance, with decedent. If the contract is viewed as an employment contract, with the payment of commissions as the source of such personal service compensation, then the settlement amount must be treated as ordinary income. Cf. *F. W. Jessop v. Commissioner*, 16 T.C. 491 (1951).

When all the preceding facts are measured against the standard formulated by the Supreme Court, that the nature and basis of the action show the nature and character of the consideration received upon compromise, we think that what petitioners received in settlement of their claims for breach of contract and intentional interference of TCI's business must be held to be ordinary income. What petitioners were suing for were lost profits, whether from loss of commissions, under the breach of contract action, or whether from loss of profits—about 90 percent of which were derived from the management contract with NW—under the intentional interference of business tort action. What petitioners received when they compromised the suit must be held to have been impressed with that same ordinary income character.

While we cannot accept the allocation of the settlement

proceeds offered by petitioners ($76,338.08 ordinary income and $143,661.92 as return of capital), we may exercise our judgment to make an allocation if the record furnishes us a basis for making an allocation to petitioners' advantage. Petitioners have the burden of proving what portion, if any, of a settlement is entitled to capital gains treatment. See *Sager Glove Corp. v. Commissioner*, 36 T.C. 1173, 1180 (1961); *Estate of Carter v. Commissioner*, 35 T.C. 326, 333 (1960); *Freeman v. Commissioner*, 33 T.C. 323, 328 (1959).

To carry such burden, petitioners rely upon the allocation of damages alleged in the complaint and argue that the rule of apportionment set forth in *Cohan v. Commissioner*, 39 F.2d 540 (2d Cir. 1930), adheres in this case. The *Cohan* rule, enunciated in *Cohan v. Commissioner, supra*, deals with the deduction of unsubstantiated business expenses for a taxpayer who demonstrated to the satisfaction of the Court that some business expenses were incurred. We are at a loss to see how this rule applies in the instant case. While in some cases we have used our best judgment in allocating a portion of settlement proceeds for capital gains treatment,[7] nonetheless, such judgment must be based upon evidence in the record and not upon a rule of convenience drawn by petitioners.

We find a paucity of evidence in the record concerning the actual basis of the settlement. The testimony offered by petitioners regarding the appraised valuation of TCI in the abortive sales attempt had apparently little, if any, bearing on the settlement amount. In contrast, the testimony of NW's president indicated that the value of TCI was equivalent to the value of future renewal commissions or approximately $207,000, which is rather close to the actual settlement figure agreed upon by the parties of $220,000.

Since the record does not afford any other basis upon which we can make an allocation to petitioners' advantage, we hold that the entire sum received in settlement of petitioners' claims, i.e., $143,661.92, represents a recovery for the relinquishment of TCI's right to receive present and future commission income as

---

[7]See, e.g., *Levens v. Commissioner*, 20 P–H Memo T.C. par. 51,330, 10 T.C.M. 1083 (1951) (wherein arbitration award proceeds were allocated one-half as ordinary income and one-half as capital gain based upon this Court's best judgment under the evidence in the record).

lost profits and is taxable to petitioners in full as ordinary income under section 61.

*Decision will be entered for the respondent.*