William Oleck and Blanche Oleck v. Commissioner.
Oleck v. Commissioner
Docket No. 77697.
United States Tax Court
T.C. Memo 1961-306; 1961 Tax Ct. Memo LEXIS 49; 20 T.C.M. (CCH) 1580; T.C.M. (RIA) 61306; October 31, 1961
*49 Harry Grossman, Esq., 545 Fifth Ave., New York, N. Y., for the petitioners. Joseph M. Touhill, Esq., and Theodore E. Davis, Esq., for the respondebt. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Respondent determined deficiencies in petitioner's income tax for the calendar year 1953 in the amount of $50,720.36. Only one element in the deficiency notice is contested by petitioner. The problem presented for our consideration is whether any of the net amount ($86,651.24) received by petitioner in the settlement of an antitrust suit is subject to income tax and, if so, what portion and whether at capital gain or ordinary income rates. Findings of Fact Some of the facts are stipulated and the stipulations, including the stipulated exhibits, are incorporated herein by this reference. Petitioners are husband and wife. Petitioner Blanche Oleck, who resides in Brooklyn, New York, is a party only due to the filing of a joint return. Petitioner William Oleck (hereinafter referred to as petitioner) resides in Miami Beach, Florida. Petitioners filed their income tax return for the taxable year 1953 with the director of internal revenue for the Upper Mnhattan *50 district of New York. In 1920 petitioner entered the business of publishing, distributing, and selling advertising space in industrial classified telephone directories. Between the years 1935 and 1945 petitioner became an officer and director of three corporations; all were named Independent Directory Corporation and all engaged in the same business as that formerly carried on by petitioner. The purpose of their formation was to disassociate the directories from the name "Oleck." The states of incorporation were New York, Illinois, and California, respectively. From the time that petitioner first entered the business of publishing classified directories, he had various disputes with American Telephone and Telegraph Company and some of its affiliates who also published classified directories. On July 9, 1947, petitioner and the abovementioned three corporations (hereinafter collectively referred to as plaintiffs) commenced an action under applicable antitrust laws in the United States District Court for the Southern District of New York (hereinafter referred to as the antitrust suit) against the American Telephone and Telegraph Company and some of its affiliates (hereinafter referred *51 to as defendants). The complaint, in part, stated as follows: 1. This action arises under the Anti-Trust Laws of the United States, L. July 2, 1890, c. 647, 26 Stat. 209 and Acts Amendatory thereto [commonly known as the Sherman Act], and L. October 15, 1914, c. 323, Section 4, 34 Stat. 731 (15 U.S.C. Sections 1-7, 15) [commonly known as the Clayton Act] * * *
16. Each of the plaintiff corporations and plaintiff William Oleck had developed and conducted a successful and profitable business and would have continued to do so but for the acts and practices of the defendants * * * 17. * * * [The] defendants herein, in or about the year 1921, entered into a conspiracy and adopted a plan and scheme to drive plaintiff William Oleck, and thereafter the plaintiff corporations, from the business of publishing their directories, by depriving plaintiff William Oleck, and thereafter the plaintiff corporations, of advertising revenues and by making it impossible for them to continue to engage in said business. Numerous illegal acts allegedly performed by defendants are listed at this point. They consist primarily of allegedly untrue statements made by defendants *52 as to the value, authorization, and business practices of plaintiffs and their directories and inducements by defendants to plaintiffs' customers to make complaints about plaintiffs to the Federal Trade Commission, United States Post Office, and Better Business Bureaus. Defendants are also alleged to have assisted plaintiffs' customers in resisting bill collection attempts by plaintiffs and to have made false statements about plaintiffs to various Better Business Bureaus. The complaint concludes as follows: 18. By reason of the aforementioned acts and practices, numerous business concerns and persons who had purchased advertising in directories published by each of the plaintiffs, have cancelled their orders for such advertising, have refused to pay the agreed price for such advertising, and have refused and failed to renew their advertising contracts in subsequent additions of each of the aforesaid directories; and as a further consequence of the aforementioned acts and practices engaged in and committed by defendants, numerous business concerns and persons have refused or declined to purchase advertising in the directories published by each of the plaintiffs. 19. By means of *53 each and all of the aforesaid acts done by the defendants in pursuance of said plan, scheme and conspiracy, defendants have greatly diminished and in many places destroyed the trade and commerce of each of the plaintiffs with advertisers in the aforementioned various states of the United States, by the loss of many orders and customers directly resulting therefrom, and the plaintiffs have been injured in their business and property by reason of said plan, scheme and conspiracy and the acts of the defendants done in pursuance thereof and to carry the same into effect, which are declared unlawful by the Anti-Trust Laws of the United States. 20. By reason thereof, plaintiff Independent of Illinois has suffered damages in an amount in excess of Five Million ($5,000,000.00) Dollars; plaintiff Independent of New York has suffered damages in an amount in excess of Five Million ($5,000,000.00) Dollars; plaintiff Independent of California has suffered damages in an amount in excess of One Million ($1,000,000.00) Dollars; and plaintiff William Oleck has suffered damages in an amount in excess of Five Million ($5,000,000.00) Dollars. WHEREFORE, plaintiffs demand judgment against the defendants *54 for the sum of Sixteen Million ($16,000,000.00) Dollars and treble damages, together with reasonable counsel fees, costs and disbursements of this action. For a period of at least 5 years voluminous depositions were taken by the litigants before notaries public. Defendants demanded and received a bill of particulars naming the directories which the plaintiffs, and specifically petitioner, published during the period from 1920 to 1941 which were forced to be discontinued due to the alleged acts of defendants. The attorneys for both plaintiffs and defendants were in agreement that plaintiffs could recover only damages suffered during the 6 years prior to the date of the filing of the antitrust complaint plus counsel fees and possible punitive damages. In questioning witnesses, including petitioner, pursuant to the taking of these depositions, defendants' attorney, except to compile material for counterclaims, restricted himself to the subject matter contained in the complaint and the bill of particulars, frequently referring to specific items contained therein, and expressed concern and attempted to gain information pertaining to alleged lost profits of plaintiffs. Petitioner's *55 counsel in the antitrust litigation took the position that, among other things, damages would be claimed for loss of profits. In the depositions taken of petitioner he was asked by defendants' attorney to state the nature of the injuries for which he was now claiming damages. He answered that his business, name, reputation, and health were all injured. The antitrust suit was settled prior to trial. The settlement stated as follows: IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties as follows: 1. Defendants will pay the sum of $190,000 to plaintiffs * * * 2. Plaintiffs' claims against the various defendants are dismissed, with prejudice. 3. The counterclaims of the defendants * * * against various of the plaintiffs are dismissed, with prejudice, except that plaintiffs agree to the entry of an order and judgment of this Court permanently enjoining them and each of them * * * from attaching to any order or contract forms to be used by any of them in the solicitation of advertising for any directory now or hereafter published by any of them, any clipping, photograph, photostat, or other copy of the physical design of any listing or advertisements *56 contained in any telephone directory copyrighted by any of the defendants named in this action. 4. Plaintiffs undertake to obtain the consent of Maury Oleck to abide by the terms of the above injunction. 5. [Defendants] will deliver a satisfaction of [the] judgment against [plaintiffs] entered on or about March 2, 1925 in the sum of $5,500 in the United States District Court for the Northern District of Illinois. 6. [Defendants] will deliver a satisfaction of [the] judgment against [plaintiffs] entered on or about October 19, 1951 in the sum of $7,000 in the United States District Court for the Southern District of California. 7. Each of the plaintiffs * * *, on the one hand, and each of the defendants named in this action, on the other hand, will execute and deliver general releases to the others, provided that the releases * * * shall exclude, respectively, the future effectiveness of the injunctions granted by the judgments referred to in paragraphs 5 and 6 hereof. 8. An order may be entered on the basis of this stipulation by either party on two days' notice to the others. Dated: March 20, 1953 Of the $190,000 received by plaintiffs in the settlement of *57 the antitrust suit, petitioner received $137,500 and, after deducting his stipulated expenses connected therewith, had a net receipt of $86,651.24. In the income tax return filed by petitioners for 1953, they reported their antitrust settlement receipts as follows: Settlement received in an Anti-Trust action as restitution for wilful damages to, and destruction of my reputation and business. Gross amount of recovery
$137,500.00
Deductions: Legal Fees of Attorneys, In-
vestigations, Research, and Ac-
counting fees and Miscellaneous
Expenses, incurred in Connection
with this action
70,833.33
Net Recovery
66,666.67
1/3 taxable as a Capital Gain
since it was a recovery for
damage and destruction of my
business - as per Schedule D
22,222.22
2/3 non Taxable - representing
punitive damages
44,444.45
Petitioner now takes the position that his original treatment of the antitrust settlement receipts was erroneous and that the money received by him was for loss of, or damage to, his character, reputation, and health and for the loss of his business capital and good will, resulting from the acts and actions of defendants and that, further, no part of this *58 recovery is attributable to the loss of profits. In determining the deficiency, respondent treated as ordinary income the difference between the total settlement of $137,500 and petitioner's allowed expenses of $50,848.76. Opinion The problem here, as it has been in a number of other similar cases, including Glenshaw Glass Co., 18 T.C. 860 (1952), affd. 211 F. 2d 928 (C.A. 3, 1954), reversed other grounds 348 U.S. 426 (1955), rehearing denied 349 U.S. 925; Obear-Nester Glass Co., 20 T.C. 1102 (1953), reversed other grounds 217 F. 2d 56 (C.A. 7, 1954), certiorari denied 348 U.S. 982; Sager Glove Corporation, 36 T.C. - (Sept. 29, 1961), is to attempt to allocate the proceeds of a settlement of antitrust litigation and to determine what amounts, if any, are capital gain or even nontaxable recovery of capital instead of being taxable as ordinary income. We think petitioner has entirely failed to sustain his burden of showing that any part of the settlement was other than ordinary income and that the record, in fact, affirmatively shows the contrary. Any attempt to convince us that the American *59 Telephone and Telegraph Company settled this litigation on the basis of damages to petitioner's health, reputation, or even good will, is eliminated by the position he takes here, as stated in his brief: [The] complaint was drawn in the form of an anti-trust action. However, this was done by the taxpayer's attorneys * * * in order to avoid the statute of limitations which would have run on an action based on the destruction of capital and/or goodwill and for the damage suffered by taxpayer's loss of character, reputation and health. [Italics supplied.] It is too incredible to merit serious consideration that the defendants' attorney would have included in the settlement figure anything whatever as attributable to causes of action which were not then available to petitioner. And that this was a difficulty, not only in the mind of petitioner's counsel in the antitrust litigation, but also known to petitioner and more significantly to counsel for defendants, appears from statements made in the presence of counsel for the defendants at the examinations before trial, of which the following exchange is typical: MR. FRAENKEL [Petitioner's counsel in the antitrust litigation]: *60 I do not see how we can claim damages for more than six years after [before?] the commencement of the action? MR. WILLIAM OLECK: As far as I am concerned I would like to recover damages for all the time that I was damaged, if I can prove it. MR. FRAENKEL: Sure you would, but I do not think the law lets you. The fact that documents were introduced here which were obtained from the files of the defendants in the antitrust litigation, possibly indicating an intention to destroy petitioner's business, is no proof that these would have been admissible in the antitrust action, [1] and even less, that they influenced the settlement figure. *61 Bearing in mind that of the $137,500 paid to petitioner, as distinguished from his corporate plaintiffs who also participated in the settlement, over $50,000 is attributable to his litigation expenses, and that presumably, at least in the absence of evidence, two-thirds of the balance could be considered as applicable to punitive damages, the remaining amount of something less than $30,000 is extremely modest to attribute to lost profits, both past and future, providing there was really any basis for the antitrust suit at all. And the latter we must assume, in view of the fact that a considerable sum was paid in settlement. For the foregoing reasons, we have concluded that the entire net amount received by petitioner was attributable to lost profits and punitive damages, taxable as ordinary income. As in Sager Glove Corporation, supra, [the] respondent's determination that the amount in controversy is taxable as ordinary income is presumptively correct, and the burden of proof was upon the petitioner to show what portion of the amount received, if any, constituted non-taxable income. * * * [Irrespective] of whether the petitioner did in fact sustain some damage to its *62 goodwill or to other capital assets, the ultimate question to be determined here is whether the amount paid in settlement was, to any extent, for such damage. * * * Upon a consideration of the record as a whole, we cannot conclude that the petitioner has met its burden * * *. Neither the complaint, nor the release, nor the evidence as a whole provides a basis for making an allocation of the recovery and finding that all or any part represented a return of capital * * * or damages for injury to petitioner's reputation or health. Petitioner makes the further contention that respondent's determination was arbitrary and unreasonable and that, as a consequence, the burden has been shifted to respondent, or at least that a further hearing is required. In Ralph Freeman, 33 T.C. 323, 331 (1959), where a similar issue was presented, we concluded as we do here: We add for completeness that respondent's determination of the deficiency is not, in our opinion, unrealistic, arbitrary, and excessive, as urged by petitioners, but rather follows the only course he could take upon the facts (and lack of facts) presented by the record. Decision will be entered for the respondent. *63 Footnotes
1. Although the evidence is inescapable that the litigation was confined to violations of the Clayton and Sherman Acts, petitioner's position appears to be that other causes of action were also included. Of these we find no evidence whatever. His brief states, for example: "Said letters, memoranda and documents would have had no relevance in an antitrust action, and if the District Court action were merely an antitrust action, the plaintiffs therein would certainly not have been permitted to obtain them during the pre-trial proceedings."↩