AD VISOR, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Ad Visor, Inc. v. Commissioner
Docket No. 10015-75.
United States Tax Court
T.C. Memo 1978-141; 1978 Tax Ct. Memo LEXIS 374; 37 T.C.M. (CCH) 606; T.C.M. (RIA) 780141; April 12, 1978, Filed Marshall N. Schwartz and Norton S. Karno, for the petitioner. Marion K. Mortensen, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: Respondent determined a deficiency of $197,473 in petitioner's Federal income tax for its taxable year ended June 30, 1972. There are four issues presented for decision: (1) Whether petitioner is entitled to deduct under section 162(a)(1), Internal Revenue Code *376 of 1954, [1] salaries paid during the fiscal year ended June 30, 1972, to corporate officers and employees in excess of amounts previously allowed by respondent; (2) whether petitioner is entitled to deductions under section 404 of the Code for contributions paid during the fiscal year ended June 30, 1972, to its qualified pension and profit-sharing plans on behalf of corporate officers and employees in excess of amounts previously allowed by respondent; (3) whether petitioner, an accrual basis taxpayer, is entitled to an ordinary and necessary business expense deduction, pursuant to section 162, in the fiscal year ended June 30, 1972, for certain claimed legal expenses; and (4) whether a certain portion of the amount received by petitioner during such fiscal year in settlement of an antitrust judgment in its favor was properly taxable as a net long-term capital gain, representing payment for loss of goodwill in excess of basis. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and the exhibits attached thereto are *377 incorporated herein by this reference and are found accordingly. Ad Visor, Inc. (petitioner), an accrual basis taxpayer, is a corporation organized in July 1967 under the laws of California, with its principal office located in Santa Ana, California. Petitioner filed a Federal income tax return for its fiscal year ended June 30, 1972, on or about September 20, 1972, with the Internal Revenue Service Center in Fresno, California. On or about February 28, 1973, petitioner filed an amended return for the same taxable year with the Fresno Service Center. Petitioner's primary purpose is and has been to engage in auditing, collecting, and advising on advertising programs for all advertising media, and, in particular, yellow page advertising. Essentially, petitioner acts as an independent advertising representative of small business clients for whom yellow page advertising is generally the only medium for conveying their message. Petitioner is the brainchild of Jack Krinsky (hereinafter referred to as Jack), a former yellow page directory sales representative for General Telephone Directory Co. (hereinafter referred to individually and collectively with the General Telephone Company *378 of California as GTD).[2] Jack graduated in 1950 from Upsala College in East Orange, New Jersey, with a bachelor of arts degree in Business Administration. After college, Jack was an owner of a liquor store and a convention tour business in New Jersey. Subsequent to those business enterprises, but still prior to moving to California in 1965, he worked as a regional distribution manager, involved in sales promotion, for Schindley Distilling Company. In July 1965, after moving to California, he obtained employment as a directory salesperson with GTD. In that capacity Jack contacted clients, solicited yellow page advertisements, and planned advertising campaigns, thereby developing a few of the skills subsequently required of him as an officer and employee of petitioner. Jack received about $18,000 annually from GTD. He left GTD in June 1967 to organize petitioner, along with two other sales representatives of GTD, Richard Dorus (hereinafter referred to as Dick) and James Dobbins. [3]
*379 Dick served as an advertising sales representative for GTD from 1964 to 1967. Prior to that time he was employed from 1957 to 1959 by a drapery company as a store manager and custom drapery consultant, and from 1959 to 1964 by J.C. Penney Company as a department manager for housewares and draperies. Dick's employment activities with GTD primarily involved the solicitation and development of client accounts. These activities also comprised his principal areas of responsibility in petitioner's operation. Dick's annual compensation from GTD was between $15,000 and $17,000. Following petitioner's organization in July 1967, Jack was named president, a position which he has held since that time. Dick was named vice-president and treasurer, and James Dobbins assumed a vice presidency. Jack's wife, Shirley Krinsky (hereinafter referred to as Shirley), was chosen as corporate secretary, an office which she still holds. Each of the corporate officers also was employed by petitioner. A resolution of the board of directors set the initial level of compensation at $300 a week for Jack, Dick, and James Dobbins. [4] However, at least with respect to Jack and Dick, such amounts were *380 not paid by petitioner during the period from 1968 to 1971, [5] reflecting to some extent petitioner's ongoing difficulties with GTD. Shirley, petitioner's secretary and office manager, maintained the corporate books and records; managed the accounts receivable and payable; and worked on client accounts generally. She received no compensation from petitioner during the period from 1968 to 1971. [6]
The initial response to petitioner's new service was favorable, resulting in more than 100 accounts for petitioner during the first two months of operation. However, petitioner's presence did not go unnoticed by GTD. Almost immediately GTD began to develop tactics designed to halt petitioner's *381 inroads into what had been previously GTD's exclusive province. GTD's actions included, among other things, repeated refusals to recognize petitioner's representation of its clients, threatened reprisals [7] against petitioner's clients for persisting in using petitioner's services, and erroneous allegations to petitioner's customers that its organizers were unreliable and had been fired by GTD. [8] These actions damaged petitioner considerably. Petitioner responded to GTD's actions by filing an antitrust suit in late 1967 against GTD for interference with petitioner's business, restraint of trade, and loss of goodwill. Petitioner's prayer for monetary damages in its complaint included: $78,711.12 for lost profits from the breach of 70 clients' contracts; $500,000 for loss of prospective business advantage; $1,250,000 for loss of goodwill; $500,000 for customer harassment and loss of business; $1,500,000 *382 in treble damages for injury to petitioner's business; and $5,000,000 in punitive and exemplary damages. During the pendency of its antitrust suit the petitioner attempted to maintain its normal business operations. However, in May 1969, petitioner was forced to cease its usual business. Thereafter, the efforts of petitioner and its officer/employees were devoted almost entirely to the prosecution of the antitrust suit. The closely held nature of petitioner and the attendant "personal stake" in its survival resulted in the expenditure of considerable efforts on petitioner's behalf by its officer/employees. The efforts of petitioner's personnel were especially significant during the taxable period at issue, which included intensive trial preparation, the trial itself from February 1972 until April 1972, and settlement negotiations after the trial. After the cessation of petitioner's normal business operations in May 1969, Jack devoted substantial amounts of time to working with petitioner's attorneys on the lawsuit and developing his own expertise, through selfeducation and individual research, in the field of yellow page advertising regulation. [9] During the taxable year *383 at issue Jack's efforts on behalf of petitioner increased dramatically to meet the heightened demands of the antitrust litigation. His services included the following: (1) assisting petitioner's attorneys in planning the preparation and presentation of the case; (2) supervising the search for potential witnesses, including an expert economist; (3) preparing an economic evaluation of petitioner's damages; (4) reviewing and organizing petitioner's documents and records; (5) meeting with his fellow officer/employees on almost a daily basis to discuss the case; (6) attending each of the numerous depositions taken in the case; (7) continuing his research into yellow page advertising regulation; (8) overseeing the review of petitioner's records by GTD's counsel; (9) testifying at the trial for 5 to 7 days; and (10) participating actively in the month-long settlement negotiations. [10]
*384 After petitioner had suspended normal business activities in May 1969, Dick obtained full-time employment with the Los Angeles Times as a display advertising salesperson. However, the nature of his position, his prior extensive advertising background, and his willingness to devote substantial amounts of time during evenings and weekends to petitioner's cause enabled him to render significant services to petitioner during the entire period from 1969 to 1972. In 1971 and 1972 Dick's services for petitioner included: (1) reviewing, organizing, and logging petitioner's records; (2) interviewing clients and former employees of GTD to obtain both potential trial witnesses and information on GTD's practices; (3) participating in ongoing meetings, relating to the litigation, with Jack, Shirley, and his wife, Hazelle Dorus (hereinafter referred to as Hazelle); (4) attending depositions and a substantial portion of the trial; and (5) starting up petitioner's business again after the trial was completed. Shirley, who had served as office manager before petitioner was compelled to halt its normal advertising activity, continued to devote time and effort to petitioner during the period *385 at issue. Although she was also employed during such period at a local hospital, [11] she nevertheless performed valuable services for petitioner, including: (1) taking primary responsibility for the organization of corporate records for use at trial; (2) participating actively in the numerous meetings concerning the litigation; (3) having her deposition taken; (4) observing the trial; and (4) contributing her observations at nightly review sessions with counsel and her fellow officer/employees. After the conclusion of the trial, Shirley was involved in both restarting petitioner's advertising operation and reviewing certain potential investments for petitioner. Hazelle began her employment with petitioner in July 1967, serving primarily as a secretary/receptionist. Additionally, she scheduled appointments, handled correspondence, set up account files, and contacted GTD about billing information. Hazelle received no compensation for her services from petitioner *386 during the period from 1968 to 1971. During the taxable period at issue Hazelle continued to apply her secretarial skills on petitioner's behalf in preparation for trial. Moreover, she assisted in processing and checking account files; attended conferences about the case both before and during the trial; prepared daily logs of petitioner's contacts with both its clients and GTD; and observed the trial for three weeks. The trial of petitioner's antitrust action against GTD began in February 1972 and resulted in a jury verdict for petitioner. A judgment, based on the jury verdict, was entered on April 7, 1972, awarding damages, including compensatory, treble, and punitive damages in the amount of $2,875,000.The jury allocated damages as follows: Restraint of trade
$300,000 which amount was trebled
Breach of contract and/or
Interference with potential business and/or
Loss of goodwill
$475,000
Punitive damages
$1,500,000
Petitioner's judgment against GTD was satisfied by an agreed settlement on May 30, 1972, for the lump sum amount of $1,050,000. No itemized allocation of the settlement amount was contained in the "release of all claims" signed on behalf *387 of the petitioner. On June 1, 1972, a special meeting of petitioner's board of directors was held. At the meeting Shirley was elected to replace Dick as treasurer, and Hazelle was elected to the board as vice-president. Additionally, the board adopted a resolution fixing salaries during the fiscal year ended June 30, 1972, for services as follows: Jack
$125,000
Shirley
40,000
Dick
50,000
Hazelle
15,000
The board resolution contained a reimbursement provision for any amounts paid by petitioner to corporate officers which were found to be nondeductible expenses of the petitioner-corporation for Federal income tax purposes.Such repayment was to be made by the individual officer who received a nondeductible amount. Petitioner paid to its officer/employees during that fiscal year the entire amount of the compensation, as determined by the board. After the litigation with GTD had been completed, petitioner attempted to resume its normal advertising operations. However, its operating ability has been hampered at all times by GTD's actions to undermine its existence. Sometime during its fiscal year ended June 30, 1972, petitioner engaged the services of *388 the law firm of Karno, Rudnick and Mihaly. The law firm provided some services for petitioner during 1971, including: (1) advising on the settlement of the antitrust suit; (2) preparing petitioner's qualified pension and profitsharing plans; and (3) advising petitioner with respect to certain potential investments. Prior to June 30, 1972, petitioner received an invoice for $40,000 from the law firm. However, the bill has not been paid. At the trial of this case, Jack, petitioner's president, acknowledged that the amount of $40,000 was the agreed upon price for legal services, but he stated that "it was dependent upon their continued performance of all of the tasks that we had agreed upon." The bill has not yet been paid because "the services that have to be performed are still ongoing." Petitioner has never declared a dividend. For its fiscal year ended June 30, 1972, petitioner reported on its original corporate income tax return taxable income of $306,959.30 on which it paid the amount of $96,593.14 in corporate income taxes. [12]
*389 On its corporate income tax return for the fiscal year ended June 30, 1972, petitioner claimed a deduction in the total amount of $230,000 for salaries and wages paid during such year to corporate officers and employees. Moreover, petitioner claimed a deduction in the amount of $57,500, [13] under section 404 of the Code, for contributions paid on behalf of corporate officers and employees to petitioner's qualified pension and profitsharing plans. Upon audit the respondent disallowed the deduction for salaries and wages to the extent that it exceeded $4,200. [14] The basis for respondent's disallowance was that such excess amount did not represent, within the purview of section 162(a)(1) of the Code, a reasonable allowance for salaries or other compensation paid for personal services actually rendered.From the deduction claimed for contributions paid to pension and profit-sharing plans, respondent disallowed that portion which exceeded $1,049. Respondent determined such amount by applying the percentage limitations on deductibility of such contributions under section 404 of the Code to the amount of deductible salaries allowed under section 162. *390 Petitioner further claimed a deduction for legal expenses in the amount of $40,000 on its corporate income tax return. Respondent disallowed the deduction on the ground that petitioner had not established that it had incurred such expense during the taxable year in question. Petitioner reported on its corporate income tax return a net long-term capital gain in the amount of $288,046.38, [15] representing that portion of the settlement award attributable to loss of goodwill in excess of its asserted basis therein. Respondent disallowed petitioner's characterization of the amount of $288,046.38 as capital gain on the ground that such amount represented ordinary income. ULTIMATE FINDINGS OF FACT 1. For its fiscal year ended June 30, 1972, the petitioner is entitled to a deduction pursuant to section 162(a)(1) for salaries paid to its officers and employees in the total amount of $124,000, allocated as follows: *391 Jack
$55,000
Shirley
24,000
Dick
30,000
Hazelle
15,000
2. Petitioner is entitled to a deduction under section 404 for contributions paid during the fiscal year ended June 30, 1972, to qualified pension and profitsharing plans on behalf of its corporate officers and employees in the amount of $31,000. 3. Petitioner is not entitled to the claimed deduction for legal expenses for its fiscal year ended June 30, 1972. 4. Respondent properly recharacterized as ordinary income the amount of $288,046.38 claimed by the petitioner as net long-term capital gain for its fiscal year ended June 30, 1972. OPINION I. Reasonableness of Salaries.
Section 162 and the regulations promulgated thereunder provide a deduction for amounts paid or incurred during the taxable year which constitute "a reasonable allowance for salaries or other compensation for personal services actually rendered." [16] The test of deductibility is twofold: (1) the amounts paid must be reasonable, and (2) the payments must be entirely for services. Sec. 1.162-7(a), Income Tax Regs. *392 ; Nor-Cal Adjusters v. Commissioner, 503 F. 2d 359 (9th Cir. 1974), affg. a Memorandum Opinion of this Court; Klamath Medical Service Bureau v. Commissioner, 29 T.C. 339 (1957), affd. 261 F. 2d 842 (9th Cir. 1958), cert. denied 359 U.S. 966 (1959). Whether the requirements for deductibility are met is a question of fact to be determined in light of all of the facts and circumstances in the case. Pacific Grains, Inc. v. Commissioner, 399 F. 2d 603 (9th Cir. 1968), affg. a Memorandum Opinion of this Court; Pepsi-Cola Bottling Co. of Salina v. Commissioner, 61 T.C. 564 (1974), affd. 528 F. 2d 176 (10th Cir. 1975). In view of the factual nature of this issue, little can be gained from an analysis of the factual patterns presented in the plethora of previously litigated cases on the question. However, certain relevant factors, generally helpful to the trier of fact, are stated succinctly in Mayson Mfg. Co. v. Commissioner, 178 F. 2d 115, 119 (6th Cir. 1949): the employee's qualifications; the nature, extent and scope of the employee's work; the size and *393 complexities of the business; a comparison of salaries paid with the gross income and the net income; the prevailing general economic conditions; comparison of salaries with distributions to stockholders; the prevailing rates of compensation for comparable positions in comparable concerns; the salary policy of the taxpayer as to all employees; and in the case of small corporations with a limited number of officers the amount of compensation paid to the particular employee in previous years. * * * *394 Respondent's determination is presumptively correct, and petitioner has the burden of proving it to be erroneous. Rule 142, Tax Court Rules of Practice and Procedure; Botany Worsted Mills v. United States, 278 U.S. 282 (1929). If petitioner succeeds in showing respondent's determination to be erroneous, the presumption of correctness is rebutted, and we must determine from the record as a whole what was reasonable compensation under these particular facts and circumstances. Pepsi-Cola Bottling Co. of Salina v. Commissioner, supra.See also Helvering v. Taylor, 293 U.S. 507 (1935). Petitioner was a new enterprise providing a unique advertising service. After a promising beginning in 1967, petitioner had to struggle against GTD's actions to cripple its operation. However, petitioner persevered by the initiation and pursuit of its antitrust suit against GTD so that it might prosper. Indeed, for a time, petitioner's entire activities were devoted to the litigation which eventually did preserve the corporation. Given the newness *395 of petitioner's business and the adverse conditions under which petitioner was attempting to survive, it is understandable that it had no history of paying dividends or that it limited the compensation paid to its officers and employees. Morever, because of the uniqueness of the specialized service provided by petitioner, there would not be much to be gained from a salary comparison with other persons engaged in the advertising industry in general. Petitioner was the brainchild of Jack Krinsky, and its early development was fostered by the four officer/employees whose compensation is at issue. Although, as respondent points out, they did not possess any substantial legal training or background prior to the antitrust suit against GTD, they each possessed the requisite background, experience and expertise for their respective positions in petitioner's advertising business. Notwithstanding their lack of prior formal legal training, they each possessed the "extra ounces of energy, thought, and devotion," [17] born of proprietary and entrepreneurial interest needed to act in any manner which would protect, in a virtual parental way, the viability of petitioner. The scope of their *396 activities on petitioner's behalf during the taxable year at issue underscores such interest. After weighing and reviewing all of the facts and circumstances, we are satisfied that petitioner has met his burden of showing respondent's determination to be erroneous. However, because petitioner was as generous in awarding salaries to three of its four officer/employees as respondent was penurious in allowing their deduction, we are unwilling to permit petitioner the full amount of the deduction which it claims under section 162. Based upon our review of the entire record herein and being mindful that determining the precise amount of reasonable compensation is comparable to determining the number of angels which can dance on the head of a pin, we find and hold that petitioner is entitled to a deduction under section 162(a)(1) for the salaries reflected in our ultimate findings of fact. II. Contributions to Qualified Pension and Profit-Sharing Plans.
Both non-deferred and deferred *397 compensation must be considered in determining the overall reasonableness of compensation paid to employees. Bianchi v. Commissioner, 66 T.C. 324 (1976); Edwin's Inc. v. United States, supra. However, although section 162 provides a deduction for amounts of "reasonable compensation" paid or incurred during the taxable year and both non-deferred and deferred compensation are considered in determining reasonableness, the deductibility of the deferred portion of such overall compensation is provided under section 404. [18] We were aware, of course, of these considerations in making our findings with respect to the deductible amount of salaries pursuant to section 162(a)(1). Additionally, we are cognizant of the percentage limitations in section 404 on deductibility of contributions paid by an employer to qualified pension and profit-sharing plans on behalf of its employees. Essentially, section 404 provides a maximum deduction for contributions paid to qualified pension and profit-sharing plans during the taxable year in the amount of 25 percent of the *398 compensation otherwise paid to the beneficiaries (i.e., the officer/employees) of such trusts or plans. Therefore, we find and hold that petitioner is entitled to a deduction for contributions paid under its qualified pension and profitsharing plans during the fiscal year ended June 30, 1972, in the amount of $31,000. [19]
*399 III. Legal Expense Deduction. Section 162 allows a deduction for all of the ordinary and necessary expenses paid or incurred in carrying on a trade or business. However, in the case of an accrual basis taxpayer, such as petitioner, expenses are deductible only for the taxable year in which all of the events have occurred that determine the fact and amount of liability. [20]
*400 In this case we are unable to find that the liability was in fact determined during the fiscal year ended June 30, 1972. Petitioner engaged the services of the law firm during the fiscal year for the agreed sum of $40,000. While some services were provided by the law firm for petitioner during that fiscal year, the payment of the $40,000 was dependent "upon their (the law firm's) continued performance of all of the tasks * * * agreed upon." Furthermore, the liability has not accrued to this date because the services are "still ongoing." Accordingly, we conclude that petitioner is not entitled to its claimed legal expense deduction. IV. Characterization of Settlement Award Proceeds. On its corporate income tax return petitioner reported the amount of $475,000 as long-term capital gain. Such amount, it is contended, represented the portion of the compromise settlement of its antitrust judgment allocable to loss of goodwill. Petitioner adjusted the gross figure by its asserted basis in goodwill of $186,953.62, and claimed a net long-term capital gain in the amount of $288,046.38. Respondent determined the amount of $288,046.38 to be ordinary income. *401 The taxability of the proceeds received in settlement of an antitrust action is dependent upon the nature of the claim for damages and the actual basis of recovery. If the recovery represents damages for lost profits, it is taxable as ordinary income. However, if the damages allowed represent recovery for destruction or injury of a capital asset, such as goodwill, they are taxable as capital gain to the extent of any excess over adjusted basis. Bresler v. Commissioner,65 T.C. 182 (1975); Sager Glove Corporation v. Commissioner,36 T.C. 1173 (1961), affd. 311 F. 2d 210 (7th Cir. 1962), cert. denied 373 U.S. 910 (1963); Freeman v. Commissioner,33 T.C. 323 (1959). Respondent's determination is presumptively correct, and petitioner bears the burden of proving that a portion of the settlement proceeds is allocable to the loss of goodwill. Bresler v. Commissioner,supra;Sager Glove Corporation v. Commissioner,supra.
Here the petitioner received a lump-sum award in the amount of $1,050,000 in a compromised *402 settlement of its antitrust suit against GTD. Although goodwill is mentioned in the release as one of the claims surrendered, there is no specific itemization of recovered amounts contained in the terms of the settlement. The complaint prays, among other things, for damages for loss of goodwill in the amount of $1,250,000. We are unable to discern even a theoretical basis for such valuation of petitioner's lost goodwill.At the time the complaint was filed the petitioner was still a new enterprise. Although the initial response to petitioner's unique service suggests substantial potential, such potential was certainly not yet realized in the form of substantially generated goodwill. The allocated jury verdict in the amount of $2,875,000 contained an itemized amount of $475,000 for breach of contract and/or potential interference with business and/or loss of goodwill. This element of the damages is the only portion potentially attributable to loss of goodwill. Petitioner contends that the final settlement amount of $1,050,000 reflects damages for loss of goodwill in the amount of $475,000. We are unable to accept its contention. The relevant portion of the verdict is styled *403 in the conjunctive/disjunctive form. This suggests that, to the jury, damages for each element contained therein constituted some portion of the total amount of $475,000 awarded. There is no way of determining how much was attributable to loss of goodwill. Petitioner may have generated some amount of goodwill during its period of operation. Further, the litigation, by preserving the corporate existence, may have enabled petitioner to acquire some additional quantum of goodwill. However, we are convinced that such goodwill did not approach the amount claimed as petitioner's basis in goodwill, much less the gross amount of $475,000 which petitioner claims. Since we think the petitioner has failed to prove the portion of the awarded damages attributable to loss of goodwill, we sustain respondent's determination with respect to the recharacterization of the amount as ordinary income. Accordingly, we hold that the amount of $288,046.38 represented ordinary income to petitioner in the fiscal year ended June 30, 1972. To reflect our conclusions on the disputed issues, Decision will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable year in issue.↩
2. While employed by GTD, Jack came to realize that the actual advertising needs of small businesses are not always considered carefully by GTD's directory sales personnel. In general, the compensation of such sales personnel is based upon the amount and the size of the ads generated by the individual representative. ↩
3. James Dobbins' involvement in petitioner's affairs ended sometime prior to the taxable year at issue. Consequently, subsequent references to him will be limited.↩
4. Apparently this initial amount was chosen in the hope of minimizing the financial risk to James Dobbins in leaving GTD and joining petitioner. ↩
5. Jack and Dick each received the amount of $3,120 in salary from petitioner during 1968. ↩
6. Shirley's background for her position with petitioner included some college education, employment as an office manager for several years, and participation in the ownership and operation of the liquor and travel businesses with Jack in New Jersey.↩
7. For example, GTD threatened to omit entirely from the yellow pages the advertisements of petitioner's clients. ↩
8. We note for emphasis that there is absolutely no evidence that the organizers of petitioner left the employ of GTD under other than voluntary circumstances.↩
9. In this context, we note that Jack has appeared before the California Public Utilities Commission on several occasions regarding yellow page advertising practices. Moreover, he has advised other businesses on this subject, and petitioner has received payment for Jack's advisory services on at least one occasion.↩
10. Jack was able to perform such services for petitioner despite a physical disability which caused him to be under medication for pain relief during the period at issue.↩
11. The section of the hospital in which Shirley worked as a supervisor operated on a 4-day work week.Such a work schedule provided Shirley with an additional full day per week to devote to petitioner's affairs.↩
12. Subsequently, on its amended corporate tax return for that year petitioner claimed a refund in the amount of $7,472.02 for corporate income taxes paid.↩
13. Petitioner apparently obtained this amount by applying the maximum percentage limitations for deductibility of such contributions found in sections 404(a)(1), 404(a)(3), and 404(a)(7)↩ of the Code to the total amount of salaries and wages paid. 14. Respondent allocated the total deductible amount allowed as follows: ↩
Jack
$2,250
Shirley
750
Dick
900
Hazelle
300
Total
$4,200
15. Petitioner determined such amount of net long-term capital gain by reducing the total portion of the settlement which it claimed was attributable to loss of goodwill (i.e., $475,000) by $186,953.62, the amount claimed by petitioner as its basis in goodwill.↩
16. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General.--There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including-- (1) a reasonable allowance for salaries or other compensation for personal services actually rendered; SEC. 1.162-7 [Income Tax Regs.] Compensation for personal services. (a) There may be included among the ordinary and necessary expenses paid or incurred in carrying on any trade or business a reasonable allowance for salaries or other compensation for personal services actually rendered. The test of deductibility in the case of compensation payments is whether they are reasonable and are in fact payments purely for services.↩
17. See Edwin's Inc. v. United States, 501 F. 2d 675, 678↩ (7th Cir. 1974).
18. SEC. 404. DEDUCTION FOR CONTRIBUTIONS OF AN EMPLOYER TO AN EMPLOYEES' TRUST OR ANNUITY PLAN AND COMPENSATION UNDER A DEFERREDPAYMENT PLAN. (a) General Rule.--If contributions are paid by an employer to or under a stock bonus, pension, profit-sharing, or annuity plan, or if compensatio is paid or accrued on account of any employee under a plan deferring the receipt of such compensation, such contributions or compensation shall not be deductible under section 162 (relating to trade or business expenses) or section 212 (relating to expenses for the production of income); but, if they satisfy the conditions of either of such sections, they shall be deductible under this section, subject, however, to the following limitations as to the amounts deductible in any year: (1) Pension trusts.--In the taxable year when paid, if the contributions are paid into a pension trust, and if such taxable year ends within or with a taxable year of the trust for which the trust is exempt under section 501(a), in an amount determined as follows: (A) an amount not in excess of 5 percent of the compensation otherwise paid or accrued during the taxable year to all the employees under the trust, * * * (B) any excess over the amount allowable under subparagraph (A) necessary to provide with respect to all of the employees under the trust the remaining unfunded cost of their past and current service credits distributed as a level amount, or a level percentage of compensation, over the remaining future service of each such employee, as determined under regulations prescribed by the Secretary or his delegate, * * * (C) in lieu of the amounts allowable under subpragraphs (A) and (B) above, an amount equal to the normal cost of the plan, as determined under regulations prescribed by the Secretary or his delegate, plus, if past service or other supplementary pension or annuity credits are provided by the plan, an amount not in excess of 10 percent of the cost which would be required to completely fund or purchase such pension or annuity credits as of the date when they are included in the plan, as determined under regulations prescribed by the Secretary or his delegate, * * * * * *
(3) Stock bonus and profit-sharing trusts.-- (A) Limits on deductible contributions.--In the taxable year when paid, if the contributions are paid into a stock bonus or profit-sharing trust, and if such taxable year ends within or with a taxable year of the trust with respect to which the trust is exempt under section 501(a), in an amount not in excess of 15 percent of the compensation otherwise paid or accrued during the taxable year to all employees under the stock bonus or profit-sharing plan. * * * * * *
(7) Limit of deduction.--If amounts are deductible under paragraphs (1) and (3), * * * in connection with 2 or more trusts, or one or more trusts and an annuity plan, the total amount deductible in a taxable year under such trusts and plans shall not exceed 25 percent of the compensation otherwise paid or accrued during the taxable year to the persons who are the beneficiaries of the trusts or plans. * * *↩
19. Our approach is consistent with that taken by both parties.↩
20. SEC. 1.461-1(a)(2)↩ [Income Tax Regs.] Taxpayer using an accrual method. Under an accrual method of accounting, an expense is deductible for the taxable year in which all the events have occurred which determine the fact of the liability and the amount thereof can be determined with reasonable accuracy. However, any expenditure which results in the creation of an asset having a useful life which extends substantially beyond the close of the taxable year may not be deductible, or may be deductible only in part, for the taxable year in which incurred. While no accrual shall be made in any case in which all of the events have not occurred which fix the liability, the fact that the exact amount of the liability which has been incurred cannot be determined will not prevent the accrual within the taxable year of such part thereof as can be computed with reasonable accuracy. * * *