WILLIAM Q. WOLFSON AND ELIZABETH WOLFSON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
WOLFSON v. COMMISSIONER
Docket No. 7711-74.
United States Tax Court
T.C. Memo 1978-445; 1978 Tax Ct. Memo LEXIS 65; 37 T.C.M. (CCH) 1847-14; November 7, 1978, Filed *65 1. P instituted suit against his former employer for libel and slander, asking for equitable relief and damages, including $144,000 for lost income and damages to his professional reputation. The Wayne County Circuit Court awarded petitioner $175,000 damages based on lost income but no equitable relief. The employer appealed and while appeal was pending, the parties settled out of court for $105,000 and all the equitable relief prayed. The settlement did not allocate the payments. Held, the $105,000 payment was made on account of damage to P's professional reputation. In the absence of any arguments to the contrary by petitioner, such amounts are included in his income. 2. In 1969 and 1970, P was a resident pursuing a three-year certificate non-degree psychiatric training program for which he received a stipend, with Northville State Hospital. The primary purpose of making payments to P was to compensate him for services provided. Held, payments received by petitioner are not excludable as a scholarship or fellowship grant within the meaning of sec. 117. 3. P also engaged in research during 1968, 1969, and 1970, which, however, had no commercial application. *66 Held, petitioner was not engaged in a trade or business as a researcher during 1969 and 1970. Held,further, amount of trade or business deductions to which petitioner is entitled as a medical doctor during these years determined . Allan Adelson, for the petitioners. Thomas R. Ascher, for the respondent. IRWIN
MEMORANDUM FINDINGS OF FACT AND OPINION IRWIN, Judge: Respondent determined deficiencies in petitioners' income tax and additions to the tax for the calendar years as follows: Addition to Tax Year
Deficiency
Sec. 6651(a)
1968
$ 56,981.62
$ 5,665.68
1969
4,596.94
1970
6,827.03
*68 Concessions having been made, the following issues remain for our consideration: [1]
(1) Whether petitioners received taxable income in 1968 as a result of a settlement with Wayne State University. Resolution of this issue turns on whether the settlement represented compensation for lost income or an amount received for injury excludable under section 104. [2]
(2) Whether funds received by petitioner-husband while engaged in the Northville Hospital Psychiatric Residency Program are excludable from gross income as a scholarship under section 117. (3) Whether petitioners are entitled to trade or business deductions under section 162 during the years 1968 through 1970. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. Petitioners William Q. Wolfson *69 and Elizabeth Wolfson, husband and wife, resided in Detroit, Michigan, at the time of filing their petition herein. [3] Petitioners filed joint Federal income tax returns for the taxable years 1968, 1969, and 1970 with the District Director of Internal Revenue at Detroit, Michigan. Petitioners' returns for the taxable years 1969 and 1970 were timely filed; for the taxable year 1968, petitioners' return was filed on November 15, 1969. A request for extension of time for filing was filed and received July 14, 1969, and granted. A request for additional time was received on October 16, 1969, and an extension of time until November 15, 1969, was granted. Petitioner attended New York University School of Medicine from 1939 to 1941, satisfactorily completing two years of study. The following year, he suffered an illness which required him to leave school. Although able to continue his studies after recovering, New York University was unwilling to permit his return, and he was thus unable to obtain admission to any other *70 class A medical school in the United States due to a rule of the Association of American Medical Colleges. As a result, petitioner enrolled at Middlesex University School of Medicine, a class B college. In 1943, he received his M.D. degree and obtained licenses to practice medicine in New York and Massachusetts. Thereafter, petitioner served an internship at Greenpoint Hospital in New York City followed by a three-year residency in metabolic and endocrine diseases at Michael Reese Hospital in Chicago, Illinois. From 1947 to 1950, he was assistant director of the department of biochemistry at Michael Reese Hospital and assistant chief of its arthritis out-patient clinic. In March 1950, petitioner accepted an offer by the University of Michigan to become associated with its Rackham Arthritis Research Unit (hereafter Rackham). While at Rackham, petitioner demonstrated that a treatment he developed was capable of restoring normal or useful vision to patients suffering from certain eye diseases previously considered untreatable. In 1951, Dr. Gordon B. Myers (hereafter Myers), then chairman of medicine at Wayne University Medical College (hereafter Wayne), was referred to petitioner *71 for treatment of an inflamatory disorder of the retina which resulted in loss of one eye and deterioration of sight in the second despite conventional therapy. Under petitioner's care, Myers regained normal vision in the second eye. As a result, Myers became personally interested in petitioner's work. Petitioner desired a position as a full-time academic physician doing teaching, clinical and basic research. Although he engaged in such acivities at Rackham, petitioner believed it was necessary to obtain a medical degree from a class A medical school in order to advance his career. Middlesex was not recognized by the Michigan Board of Registration in Medicine as a basis for permanent licensing. Myers suggested to petitioner that he enroll as a medical student at Wayne, a class A school, to satisfy the requirements of the Association of American Medical Colleges. On May 19, 1953, petitioner moved to Wayne with his equipment from Rackham. On the same day, Myers prepared and signed a nomination for petitioner's appointment as research associate. Petitioner was appointed by the dean of the medical college to the voluntary faculty of Wayne as a non-salaried research associate *72 in medicine. As such, his appointment was not subject to the Board of Education, the governing body of the University. On May 19, 1953, Myers wrote to Dr. Pemberthy, chairman of the Michigan Volunteer Advisory Committee, requesting that petitioner be reclassified as essential to the college of medicine in order to maintain his deferment from the Armed Services. Although the Selective Service had granted petitioner a deferment while he was employed at Rackham, he would lose his deferment if he came to Wayne unless the college satisfied the Selective Service that petitioner was a full-time faculty member and his work was essential for the national health and welfare. Wayne did not have any clinical facilities of its own and depended primarily on Detroit Receiving Hospital (hereafter Hospital). Since petitioner's work involved study on patients, he had to make use of the Hospital's facilities. Upon Myers' recommendation, petitioner received an appointment as a fellow in medicine at the Hospital entitling him to study patients there. Requests for public and private grants were sought by petitioner, with the support of Myers, to finance the newly established Unit for Metabolic *73 Research. Grants of $8,500 in 1953 and $8,000 in 1954 were received from Armour Laboratories. An additional grant of $15,000 in 1953 was received from the U.S. Army, which noted petitioner's position as associate of medicine. Other grants were awarded Wayne for use in petitioner's research, all of which described petitioner as director of the unit for metabolic research to which petitioner devoted his time and effort until his entry into the Army in October 1954. On September 14, 1953, petitioner registered as a third-year medical student. He was to satisfy all student requirements by doing the work of a full-time member of the faculty and by passing the examinations in such third- and fourth-year courses unless exempted by the chairman of the department giving the examination. Petitioner was allowed to practice medicine while a student at Wayne under a cease and desist order. [4]
On August 1, 1954, Wayne was notified that petitioner (a reserve officer in the Army) was to be called to active duty. A request that petitioner *74 be considered essential was made at a meeting on July 12, 1954, where his status as a full-time research associate in medicine was reaffirmed. Several other documents were prepared to obtain a deferment for petitioner, but despite these efforts, he was ordered into active service on October 16, 1954. Just prior to his induction, letters were received by Wayne from Italy from a father bringing his two blind children to Detroit to be treated by petitioner. This incident received national publicity resulting in television interviews of petitioner. During the interviews, the visit of the children was linked to petitioner's induction and continuing efforts by patients at the unit for metabolic research to obtain petitioner's deferment. The following day, the Detroit Free Press stated that petitioner was a student without license to practice medicine in Michigan. The paper also quoted Dr. Bromme, a faculty member at Wayne, of accusing petitioner of exploiting the children's plight to keep out of the Army. The press then interviewed Myers concerning petitioner's status. In the interview, Myers praised petitioner highly, noted he was considered essential to Wayne, and that petitioner *75 had nothing to do with the patients writing letters of support. When asked if petitioner was licensed to practice medicine, Myers replied he was not; when asked if petitioner was a student, Myers replied he was. On November 1, 1954, Wayne replied to the editor of Audio Digest, a widely distributed medical publication considering petitioner for a position as a contributing editor. The reply, signed by the assistant dean of the medical college, stated: Dr. Wolfson was not a member of our faculty but was enrolled as a regular student * * *. The publicity which we received was the result of an unfortunate combination of statements, most of which were true. * * * We have complete records to support his role as a medical student, operating under adequate supervision of patient care. While in active service, petitioner sought a retraction from Dr. Bromme and the Detroit Free Press and support from Dean Scott of the medical college. Dean Scott suggested in strong language that petitioner not pursue the matter further. It was apparent Wayne would not support petitioner in his efforts to gain retractions, and petitioner felt he was being called a liar by the school. While *76 petitioner was on active duty, Dr. Young continued the work in the Unit for Metabolic Research. However, on July 11, 1956, Myers wrote Wilson Laboratories that the unit had been terminated in 1955 and all grants were returned to the donors unused. Despite these available grants, Myers advised Dr. Oren of the Miami Medical School that there were no financial or physical facilities for petitioner at Wayne. In August 1956, in answer to an inquiry from the attorney general of Michigan who sought to determine whether petitioner was entitled to veteran's employment rights under state law, Provost Neef wrote: The Dean of the College assures me that Major Wolfson was never employed by the College of Medicine; that he was a student in the College at the time he entered military service; was the recipient of a scholarship or fellowship from Armour Company, and, as a volunteer did some research using the College of Medicine Laboratories. No record of his ever being cleared for appointment with the Board of Education appears to exist, and this would have been an essential part of any appointment at the University. Upon his honorable discharge from the Army, petitioner returned to Wayne *77 and fulfilled the remaining requirements for his senior year.
On June 12, 1957, the day before receiving his M.D. degree, petitioner wrote Dean Scott requesting his records be corrected to reflect his proper status. By letter of July 9, 1957, Dean Scott advised petitioner that his claim would be investigated. On August 12, 1958, Dr. Wolfson filed a petition with the Board of Governors. The Board of Governors referred the petition to a committee to which Dean Scott filed an answer. Although he attached many supporting documents, Dean Scott did not call attention of the board to numerous documents then in the possession of Wayne which supported petitioner's claim. On May 20, 1957, at petitioner's request, Dean Scott wrote to the chairman of the department of medicine at the University of Miami where petitioner was seeking a position. The letter, although generally very favorable, did not mention any position held by petitioner at Wayne, except as research worker. In July 1957, Dean Scott wrote to the Medical Bureau in response to an inquiry for information concerning petitioner's efforts to secure an appointment. The letter was similar in most respects to that he wrote the *78 University of Miami. Petitioner also wrote to the Wayne County Medical Society and the attorney general of the State of Michigan seeking a correction of his records but was unsuccessful. On January 28, 1960, petitioner filed suit in the Wayne County Circuit Court against Wayne, Myers, and Dean Scott. The bill of complaint asked, in pertinent part, for the following relief: 2. That the defendant, Wayne State University, by and through its Board of Governors, be instructed to correct, reform, and supplement the records of the College of Medicine to indicate the true status of your plaintiff at the time of his association with Wayne State University, and to thereafter correctly and completely maintain same consistent with plaintiff's rights therein, and to thereafter make same available and disseminate same upon inquiry. 3. That this Court will require Wayne State University, by and through its Board of Governors, to invest your plaintiff with the faculty status that he would have had but for the wrongful acts and actions of the defendants, namely, that of Assistant Professor in Medicine. 4. That the defendant, Wayne State University, by and through the defendants Scott *79 and Myers, or others lawfully authorized so to do, be required to send out letters of correction indicating your plaintiff's status during his association with Wayne State University from June of 1953 to October of 1954, and that the same be disseminated to the appropriate professional groups within the plaintiff's specialty and to the employment agencies concerned, namely the Larson Agency of Chicago. 5. That during the pendency of this suit, the defendants Scott and Myers be enjoined from disseminating to the medical profession statements, written or oral, which in any way indicate that your plaintiff's association with Wayne University was in the capacity of a medical student only, and that upon final hearing this injunction be made permanent. 6. That the remaining proceeds of the Wilson grant be restored to the plaintiff to be used in accordance with its original purpose.
7. That your plaintiff be awarded damages from the defendants in such sum as will compensate him for his loss of earnings as the result of defendants' actions, as well as his damage to his professional reputation, suffered to date by defendants' actions. 8. That your plaintiff may have such other *80 and further relief as this Court may deem equitable. On May 4, 1965, petitioner's attorney wrote Judge Kaufman and outlined terms for settlement. Most important were rectification of Wayne's records and reinstatement of petitioner in his former positions at Wayne. The parties were unable to reach a settlement. In petitioner's brief in his proposed conclusions of law, he reiterated that his claim was essentially one in equity. Relief requested was essentially the same as the relief sought in the bill of complaint, except that he requested $18,000 per year ($144,000 total) for loss of income. During the course of the suit, Wayne made a motion to dismiss on the grounds that the court had no jurisdiction to entertain claims against the governing body of a state university. The court granted such motion, to the extent that plaintiff [petitioner herein] seeks to recover for libel, slander and defamation. These are specific torts where jurisdiction is vested elsewhere. This Court does, however, have and will retain jurisdiction over the University concerning the equitable nature of the relief sought which would include the assessment of damages, if any, as a result or in consequence *81 of those elements in which equitable relief is merited. A motion to dismiss on behalf of Scott was also granted on the grounds, he evinced no personal malice which might cause the onus of personal liability to devolve upon him and that he acted, as he thought, in the best interest of the University. * * * Myers was dismissed from the action previously for similar reasons. Continuing, the court held: As to the question of jurisdiction of this Court to award damages against State officers or a State agency, Justice Dethmers in the case of Eager v. State Highway Commissioner, 376 Mich. 148, said in a similar situation that "In reality, the claim is not for damages but compensation…." This involved also the question of jurisdiction of the Circuit Court as opposed to the Court of Claims. Plaintiff has suffered substantially in a monetary sense for his inability to continue in his chosen branch in the field of medicine.It matters not that he could have earned more as a doctor in private practice. He chose the field of research, medical investigation and writing. The plaintiff has been effectively prevented from pursuing these areas of endeavor due to the *82 nature and method of progression in this academic world as the testimony and evidence disclosed. What amount can this Court award as compensation for the years of inactivity precipitated by defendants' actions or inaction, as the case may be? Clearly it would be for the minimum plaintiff could expect to have received as compensation from these academic activities plus the minimum he might expect to earn from consultation as a result of the research and faculty position and the possibility of this continuing for the duration of his life expectancy. Based upon these minimums, the Court will award as consequent damages sustained by plaintiff the sum of $175,000.00. However, no equitable relief was granted. Wayne filed an appeal on November 22, 1965, but on October 30, 1968, petitioner and the board of governors of Wayne settled the case out of court. [5]
*83 The release and agreement in settlement of all claims provided that petitioner would receive $105,000; that the records of Wayne as they pertained to petitioner would reflect the fact that petitioner occupied the position of research associate and director of the unit for metabolic research on the faculty of the school of medicine for the period September 1, 1952, to October 15, 1954; and that Wayne would forward the foregoing information to any and all persons who might inquire as to petitioner's relationship with Wayne. In consideration for the foregoing, petitioner agreed to provide Wayne with a general release and a stipulation dismissing the appeal and vacating the judgment entered in the Wayne County Circuit Court on November 5, 1965. On December 30, 1968, an order was entered in the Wayne County Circuit Court vacating the judgment. Petitioner incurred $38,974.40 in legal expenses related to this suit. During the years 1969 and 1970, petitioner was a resident with Northville State Hospital (hereafter Northville), an educational institute with a three-year certificate, non-degree psychiatric residence training program which qualifies its graduates to be certified as psychiatrists *84 upon its completion and examination. A resident was a student who already had his M.D. degree plus one year of internship. The National Institute of Mental Health (hereafter NIMH) made a grant available to petitioner in 1969 and 1970 to enable him to participate in Northville's training program. Although Northville apparently administered the NIMH grants, not all residents in the program received NIMH grants, however, and those that did not were required to obtain funding elsewhere. The grants were given in order to encourage doctors to give up their practices to study psychiatry and were meant to pay for only essential items such as food and lodging. Petitioner was assigned to gain his clinical experience by working under supervision with patients. Such work included diagnosing and prescribing treatment and giving prescriptions and injections. The residents maintained regular hours which included classroom hours and were also subject to call on off-duty hours. There was also an attending physician on call if the resident needed advice.In addition to the clinical aspects of his work at Northville, petitioner was required to complete an extensive academic part of training *85 (lectures, seminars, conferences, etc.).Petitioner's duties to Northville were no different from those enrolled in the program but who did not receive a grant from NIMH. Petitioner made no commitment to continue at Northville after certification. Petitioner received extra compensation for time spent on call and during 1970 received an additional dependency allowance. No withholding tax or social security was taken out of petitioner's stipend, nor were any retirement benefits or fringe benefits available to Northville's employees afforded petitioner, although he was entitled to a vacation. Moreover, the State of Michigan supplemented NIMH's grant by $2,500 in 1969 to provide additional funds to support doctors in the program in hope of encouraging greater participation. During 1968, petitioner maintained a walk-in counseling center at St. Bonaventure's Monastery in Detroit and from 1968 to 1970 maintained a research laboratory in his home in which he did medical research which had no commercial application. During those years, petitioner was licensed to practice medicine in Michigan, but reported no income from either a business or profession during 1968 to 1970. OPINION
*86 Issue 1
The first issue which we must resolve is whether petitioner received taxable income as a result of the settlement with Wayne. Before reaching this question, however, an initial evidentiary matter which must be resolved is the effect to be given Judge Kaufman's opinion and his later testimony in this case. [6] Respondent maintains that to the extent Judge Kaufman's testimony is inconsistent with the opinion he rendered in the suit petitioner filed against Wayne, Dr. Scott, and Dr. Myers, it must be disregarded because it is at variance with the stipulated facts. *87 Rule 91(e), Tax Court Rules of Practice and Procedure states, in part: (e) Binding Effect: A stipulation shall be treated, to the extent of its terms, as a conclusive admission by the parties to the stipulation, unless otherwise permitted by the Court or agreed upon by those parties. The Court will not permit a party to a stipulation to qualify, change, or contradict a stipulation in whole or in part, except that it may do so where justice requires. * * * Stipulation 37 states: "The Honorable Charles Kaufman, Circuit Judge, Wayne County Circuit Court rendered his opinion on October 25, 1965. A copy of Judge Kaufman's opinion is attached as Exhibit 19-S." It, of course, would have been more cautious for petitioner to state in the stipulation that he was stipulating only to the authenticity of the exhibit, but not to the legal interpretation or effect of the statements contained therein.The meaning of the particular paragraph, however, should be obtained from a reading of the entire stipulation. Gunderson Bros. Engineering Corp. v. Commissioner,42 T.C. 419 (1964). *88 We believe the stipulation was meant only to provide a chronology of the largely uncontroverted events leading to and including the settlement Accordingly, Judge Kaufman's testimony as to what he believed was the nature of petitioner's claims provides us with evidence as to the nature of the recovery. On the other hand, petitioner contends that Judge Kaufman's opinion (and the pleadings and other documents pertaining thereto) must be disregarded in their entirety because the decision was vacated upon settlement. Petitioner bases his argument on the theory that as a matter of law the opinion is a nullity because it was vacated, quoting 46 Am. Jur. 2d (1969) at p. 831: The opening of a judgment is distinguishable from the vacation of a judgment; [10] the court may refuse to vacate a judgment while directing that it be opened, [11] or, instead of opening it, the court may direct that the judgment be set aside. [12] The principal difference is that a judgment which is vacated is destroyed in its entirety upon the granting of the application for the vacation * * *. [Footnotes omitted] In *89 Sager Glove Corp. v. Commissioner,36 T.C. 1173 (1961), affd. 311 F.2d 210 (7th Cir. 1962), certiorari denied 373 U.S. 910 (1963), an antitrust suit was tried and damages of $975,000 were awarded (three times the jury's verdict). The court, however, granted a motion for a new trial and the case was settled out of court for $478,142 by the parties. The general release did not specify to what extent, if any, the settlement was allocable to recovery of lost profits, compensation for injury to capital, or to punitive damages, although reference was made therein to the fact that such balance was the amount of damages plaintiff had claimed at trial. That court looked to the complaint and instructions given the jury in the antitrust suit to aid in its determination of the nature of the damages. In Telefilm, Inc. v. Commissioner,21 T.C. 688 (1954), reversed and remanded in an unreported opinion (9th Cir. May 2, 1955, 5 AFTR 2d 1804, 55-1 USTC par. 9453), the jury had rendered a verdict for the plaintiff-petitioner in the state courts, but a motion by defendants there for a new trial had been granted. Plaintiff-petitioner *90 filed a proceeding in mandamus to compel the lower court to issue execution on the judgment entered upon the verdict. The court granted the writ, but was then reversed by the Supreme Court of California, and petition for certiorari was filed with the United States Supreme Court. While this petition was pending, the parties settled their case. The court held the "nature of the recovery will have to be determined from claims made in the pleadings, the issues presented to the jury, and from such assistance as we are able to obtain from the release itself." [7]
In State Fish Corp. v. Commissioner,48 T.C. 465, 472 (1967), supp. opinion 49 T.C. 13 (1967), the parties settled for $12,250 out of court after a jury trial granted plaintiff-petitioner $13,295.63. This Court prorated the settlement over the various items making up the court award. Further, we held "the nature of the recovery *91 is to be determined from the claims made in the pleadings or complaint filed in the prior action and the issues and evidence there presented to the jury." See also Raytheon Production Corp. v. Commissioner,144 F.2d 110 (1st Cir. 1944), certiorari denied 323 U.S. 779 (1944), affg. 1 T.C. 952 (1943); Commissioner v. Murdoch,318 F.2d 414 (3d Cir. 1963), affg. a Memorandum Opinion of this Court; Freeman v. Commissioner,33 T.C. 323 (1959); and Henry v. Commissioner,62 T.C. 605 (1974), where we held that the "nature and basis of the action show the nature and character of the consideration received upon compromise," quoting Megargel v. Commissioner,3 T.C. 238, 243 (1944), (cases involving settlement before trial, courts looked to complaint). We believe, therefore, that to determine the nature of the recovery, we must look to the pleadings and complaint in the prior action, and the issues and evidence before that court. The actual decision rendered by Judge Kaufman is not dispositive of the nature of the damages, but provides some evidence as to the nature of the *92 relief sought. [8]
Section 104(a)(2) excludes from gross income "the amount of any damages received (whether by suit or agreement) on account of personal injuries or sickness." The law is settled that petitioner must show the nature of the claim which was the actual basis for settlement, not the validity of the claim; Seay v. Commissioner,58 T.C. 32 (1972); the proper inquiry being in lieu of what were damages awarded. Entwicklungs & Finanzierungs A.G. v. Commissioner,68 T.C. 749, 759 (1977); Yates Industries, Inc. v. Commissioner,58 T.C. 961, 972 (1972), affd. without published opinion 480 F.2d 920 (3rd Cir. 1973); Young v. Commissioner,16 T.C. 1424 (1951). If the award of damages was in lieu of income, then section 104 clearly does not apply and amounts received are taxable. State Fish Corp. v. Commissioner,48 T.C. 465, 472 (1967), supp. opinion 49 T.C. 13 (1967). If the settlement was for *93 defamation or libel, then section 104 applies to exclude income if the claim was for defamation of petitioner's personal reputation. Hawkins v. Commissioner,6 B.T.A. 1023 (1927). If the claim was for defamation of petitioner's professional reputation, it is respondent's position such damages are in lieu of future or past income which would be compensatory by nature and taxable as ordinary income, relying on Rev. Rul. 58-418, 1958-2 C.B. 18. [9]
We believe on the facts of this case that the award of damages petitioner received represented compensation for loss to his professional reputation. The record plainly shows that petitioner's primary concern was to effect correction of his status in order to be able to continue in research. After the libel and slander, but before the suit was commenced, petitioner sought unsuccessfully to gain retractions from Dr. Bromme *94 and the Detroit Free Press. He actively sought support from Dean Scott and wrote the Wayne County Medical Society and attorney general of the State of Michigan to correct his records, but was unsuccessful.
The bill of complaint contained five paragraphs dealing solely with correcting petitioner's records and status. One paragraph dealt with damages for loss of earnings as well as for damages to petitioner's professional reputation. A final paragraph asked for any other relief the Court might deem equitable. But no damages were sought for libel or slander to his personal reputation. When petitioner's attorney wrote Judge Kaufman outlining terms for settlement, most important was rectification of Wayne's records and reinstatement of petitioner in his former positions at Wayne. In petitioner's brief he sought relief similar to that which he had sought in the bill of complaint, except that he requested $144,000 for loss of income. Decision was rendered awarding $175,000 damages but no equitable relief. The fact that the amount of damages awarded petitioner was greater than that requested for lost income indicates that injury to his professional reputation must have been at least *95 a factor in the damages awarded. Moreover, while the appeal was pending, the parties settled for $105,000 and essentially all the equitable relief requested by petitioner, again indicating such equitable relief was of primary importance. Although Judge Kaufman's opinion may be read (as respondent reads it) as indicating that the damages awarded were for lost and future income (a reading with which we do not necessarily agree), his later testimony was that the damages were awarded for libel and slander. Petitioner contends that because Wayne continually praised his work the defamation was to his personal reputation, not his business reputation. We have no doubt petitioner felt he was being called a liar; however, as we noted earlier, no damages were sought for personal slander and libel and the entire thrust of petitioner's efforts was to regain his former position in the medical field and recognition of his proper status. The evidence shows petitioner was effectively prevented from pursuing his career because his professional reputation had been destroyed and that he was concerned with restoring his good name in his field. As we noted supra in footnote 9, petitioner does not *96 address the issue of whether damages to an employee's professional reputation are excludable from income, apparently conceding the validity of Rev. Rul. 58-418. For this reason, we hold the amounts are includable in income. We expressly leave open the questions, however, of whether there is a valid distinction between damage to one's personal reputation and damage to an employee's professional reputation [10] for purposes of section 104(a)(2), and, assuming there is a valid distinction, whether an award for damages to an employee's professional reputation nonetheless represents a nontaxable return of capital. Cf. Wallace v. Commissioner,T.C. Memo. 1976-219. Issue 2
A scholarship or fellowship grant is excludable from income under section 117(a). Although "scholarship" and "fellowship grant" are not defined in the statute, section 1.117-3(c) of the Income Tax Regulations *97 provides: "A fellowship grant generally means an amount paid or allowed to, or for the benefit of, an individual to aid him in the pursuit of study or research." In addition, section 1.117-4(c)(1) of such regulations states that if any "amount represents either compensation for past, present, or future employment services or represents payment for services which are subject to the direction or supervision of the grantor," it does not qualify for exclusion under section 117. The Supreme Court upheld the validity of these regulations and stated that the definitions contained therein comport with "the ordinary understanding of 'scholarships' and 'fellowships' as relatively disinterested, 'no-strings' educational grants, with no requirement of any substantial quid pro quo from recipients," Bingler v. Johnson,394 U.S. 741 (1969). The test to be applied under the regulations is whether the primary purpose for making the payments to the taxpayer was to educate and train him or to compensate him for services rendered. Weinberg v. Commissioner,64 T.C. 771 (1975); Carroll v. Commissioner,60 T.C. 96 (1973); Proskey v. Commissioner,51 T.C. 918 (1969); *98 Reese v. Commissioner,45 T.C. 407 (1966), affd. per curiam 373 F.2d 742 (4th Cir. 1967). Petitioner agrees that if we determine he received a scholarship or fellowship grant, only $3,300 (11 months X $300) in 1969 and $3,600 (12 months X $300) in 1970 are excludable due to the limitations imposed by section 117(b) (2)(B). Initially, we must decide if Northville or NIMH was grantor of the stipend. Although Northville administered the NIMH grant, the funds were, apparently, specifically set aside for petitioner's benefit. The record is silent, however, as to whether NIMH or Northville chose petitioner to participate in the program. Northville controlled and was responsible for the training petitioner received. Based upon these factors, Northville must be considered the grantor of the NIMH grant. See Bailey v. Commissioner,60 T.C. 447 (1973); see also Fisher v. Commissioner,56 T.C. 1201 (1971).
It is undisputed from the record that the primary purpose of the grant by NIMH was to lure medical doctors into psychiatry to relieve the acute shortage of trained psychiatrists. Because we have determined Northville *99 was the grantor, however, NIMH's purpose in awarding the grant is irrelevant to our consideration. We must, therefore, look to Northville to determine whether the payments were made in return for petitioner's services. Willie v. Commissioner,57 T.C. 383, 389 (1971). The purpose of the hospital in making the grant is, in large part, suggested by the nature of the activities carried on by petitioner. Bailey v. Commissioner,supra at 452. And even if the primary purpose of Northville, as a training hospital, is to educate interns and residents, the stipends do not qualify under section 117 if the primary purpose for payment was to compensate the recipients for medical services. Rosenthal v. Commissioner,63 T.C. 454, 460 (1975). We believe petitioner rendered extensive and valuable services to Northville, including diagnosing and prescribing treatment and giving prescriptions and injections. Moreover, the residents maintained regular hours and were also subject to call on off-duty hours. The effect of these services was clearly to provide a quid pro quo. Thus, the primary purpose of the payments made by Northville was *100 to compensate petitioner for these services. The fact that staff physicians spent a considerable period of time supervising interns and residents is not necessarily inconsistent with an employer-employee relationship. Brubakken v. Commissioner,67 T.C. 249, 251 (1976); Fisher v. Commissioner,56 T.C. 1201, 1215 (1971). We also attach little weight to testimony that it cost Northville more to train a resident than it received in services provided by the resident and that Northville would not have had a difficult time proceeding with treatment of patients without the residents. Brubakken v. Commissioner,supra, at 256; Fisher v. Commissioner,supra.
To be sure, there are some factors which tend to show that petitioner's duties to Northville were not compensatory in nature. Petitioner received an additional $1,760 dependency allowance and did not receive the fringe benefits normally available to hospital employees. Moreover, Northville did not withhold Federal income taxes or social security from the grant. *101 These factors, however, are not determinative and on balance, based upon a very incomplete record, we hold that the stipend received by petitioner is not excludable from gross income. [11]
Issue 3
Section 162(a) provides there shall be allowed as a deduction all the ordinary and necessary *102 expenses paid or incurred during the taxable year in carrying on any trade or business. Respondent contends petitioner was not in a trade or business during 1968, 1969, or 1970 and thus not entitled to any deductions under section 162. Petitioner maintains he should be entitled to deduct automobile expenses, malpractice insurance, professional dues, subscriptions, travel to conventions, costs of a medical library, and research expenses [12] because at all times he was engaged as a medical doctor and as a researcher. In the event we hold that petitioner was engaged in a trade or business, respondent, in the alternative, contends that petitioner has failed to substantiate his claims. We will first consider petitioner's research activities. The evidence clearly shows that they do not rise to the level of a trade or business. The research did not result in any customers, *103 sales, or income, and was directed towards activities having no commercial application. Upon these facts, we cannot find the necessary profit motive in petitioner's research to find he was engaged in a trade or business. Accordingly, those deductions that relate specifically to petitioner's research in all years must be disallowed. Similarly, with respect to expenses based on the walk-in counseling center mainted by petitioner during 1968, there does not appear to be any profit motive in his activities. In fact, his activities at the center are unstated in the record and we cannot be certain what services he provided. Petitioner, moreover, showed zero gross receipts on his Schedule C for 1968 and we assume, therefore, that no charges were ever made by petitioner for any services provided. And while the absence of a profit or income will not prevent an activity from being classified as a trade or business, the taxpayer must at least enter into the activity with the objective of making a profit. Section 1.183-2(a), Income Tax Regs. We do not believe petitioner *104 has met his burden of proof for 1968.Therefore, those additional expenses incurred during 1968 for professional dues, books, subscriptions, etc., must also be disallowed. As to the expenses claimed for 1969 and 1970 that do not relate to petitioner's research, our determination depends upon whether we find petitioner was engaged in the trade or business of being a doctor while at Northville. Since we have held that the NIMH grant was for services provided, it is clear that petitioner was in a trade or business. We must now determine if petitioner has substantiated his claims for these years. Based upon the record, we believe that petitioner is entitled to deductions in the amount claimed for malpractice insurance, dues to medical associations and for journals, and depreciation for his medical library. [13]
Transportation expenses were claimed using the optional method computed at 10,000 miles during 1969 and 1970. Petitioner testified that this mileage was incurred primarily for travel from his home to Northville and in part for travel from Northville to St. Bonaventure's. The *105 costs of transportation to Northville from home and to home from Northville are clearly nondeductible commuting expenses. Fausner v. Commissioner,413 U.S. 838 (1973). We must also disallow the expenses incurred in travelling between Northville and the monastery. First, there is nothing in the record from which we can reasonably estimate this amount. Second, since petitioner was not engaged in a trade or business at St. Bonaventure's, such amounts would not properly be a business deduction. [14] But cf. Laurano v. Commissioner,69 T.C. 723 (1978); Green v. Commissioner,59 T.C. 456 (1972); Fausner v. Commissioner,55 T.C. 620 (1971). The final item claimed is for travel and conventions. These expenses are subject to stricter substantiation under section 274(d) than are the other business expenses mentioned previously. Although petitioner has introduced checks which tend to substantiate that he incurred many of the payments *106 deducted we cannot ascertain the business purpose to which these expenses relate. Accordingly we must deny petitioner a deduction for these items.
Decision will be entered under Rule 155.
Footnotes
1. Petitioners did not challenge the addition to tax in 1968 on brief or at trial. Petitioners did raise the issue in their petition, but we must assume they no longer dispute it.↩
2. All statutory references are to the Internal Revenue Code of 1954 in effect during the taxable years in issue.↩
3. Elizabeth Wolfson is a petitioner herein by reason of having filed a joint return with her husband. References to petitioner are to William Q. Wolfson.↩
4. A limited medical license for someone who does not have a permanent license and whose practice is confined to activities within a specified facility.↩
5. On the same day as the release and settlement was entered into, the president of Wayne wrote petitioner, in part: I regret the tragedy that this litigation has represented. The concern that you and your family have experienced is self-evident. Unfortunately, the past cannot be changed, and what has been done may not be undone. However, in the spirit of rational compromise of a situation that has quite passed beyond the control of either you or the University, I can advise you that the University's records have been corrected to reflect your positions of Research Associate, and Director of the Unit for Metabolic Research on the faculty of the School of Medicine for the years September 1, 1952 to October 15, 1954. Finally, although I fully recognize that dollars may never be equated with principle, in settlement of the judgment obtained by you against the University, the Board of Governors has agreed that you will receive the sum of $105,000 in order that you may be reimbursed for your expenses since 1957, and in recognition of the University's responsibility in this matter.↩
6. Judge Kaufman testified that the meaning of "consequent damages" was "[not] really in lieu of income but it was an attempt to make him [petitioner] whole as a result of what he lost as a result of the actions of Wayne University. Those actions would being the libel, slander and defamation. [sic]" We agree with Judge Kaufman↩'s testimony that damages were not for lost income as such. But we believe his testimony that he wanted "to make [petitioner] whole as a result of what he lost" does not establish that he awarded damages for injury to petitioner's personal reputation but rather for injury to petitioner's business reputation; what petitioner lost was his professional standing.
10. See Agar v. Commissioner,290 F.2d 283 (2d Cir. 1961); cf. also Kleinschmidt v. Commissioner,12 T.C. 921 (1949) with Draper v. Commissioner,26 T.C. 201↩ (1956).
11. We note that some residents in the program did not receive NIMH grants but were required to perform the same services as petitioner. It is not clear whether these other residents were recipients of other grants, although if they were not, we would find it difficult to hold that the payments were for services. Often, residents in a program will receive grants from different sources but be paid the same amount by the hospital, which, as here, is the administrator of the program and the grants. Unfortunately, the record is almost totally lacking on how the grants work and how much other residents were paid, if any. Because the burden of proof is on the petitioner, we cannot simply infer facts favorable to him and, in the absence of any additional evidence, we must hold in favor of respondent.↩
12. In 1969 and 1970, these would be the home office deduction which related primarily to petitioner's research and telephone expenses which, presumably, related to the home office. Also, certain of the conventions to which petitioner travelled in 1970 were apparently in relation to his research activities.↩
7. In this case the settlement agreement gives no indication as to what the parties were settling, and a letter written by the president of Wayne also provides little insight.↩
8. See Drummond v. Commissioner,T.C. Memo. 1976-55↩.
9. Petitioner does not address himself to this issue, however, relying solely upon his contention that the damages were for libel to his personal reputation; accordingly, petitioner did not adopt an alternative position in the event we found that damages were to his business reputation.↩
13. Respondent does not challenge the rate of depreciation but only the purchase price.↩
14. Petitioner does not contend that he performed charitable services at St. Bonaventure's entitling him to a charitable deduction for at least some of his out-of-pocket expenses.↩